**In re SEALED CASE.**

**No. 81–1717.**

United States Court of Appeals,
District of Columbia Circuit.

Submitted Without Argument.

Decided April 23, 1982.

797

Before WRIGHT, TAMM and WALD, Circuit Judges.

Opinion for the court filed by Circuit Judge J. SKELLY WRIGHT.

Circuit Judge TAMM concurs in the result.

Circuit Judge WALD filed an opinion concurring in Parts I, II, IV and V of Circuit Judge J. SKELLY WRIGHT's opinion and in the result.

J. SKELLY WRIGHT, Circuit Judge:

This case requires us to consider how far the "work product" doctrine shields the files of a corporation's in-house lawyer from scrutiny by a federal grand jury investigating corporate abuses. Appellant ("Company")[1] is a multinational, "Fortune 500" cor-

---

1. Both appellant and the government have moved that the record in this case remain under seal and have asked us to avoid identifying the parties in our opinion. We granted the motion to seal. In order to preserve the confidentiality of an ongoing grand jury investigation, we refer to appellant simply as "Company" and we do not provide the names of the

poration whose activities have come under investigation by a grand jury for possible conspiracy to defraud the government and obstruction of justice. The District Court has held Company's agent in contempt of court for refusing to produce before the grand jury eight items from the files of Company's former general counsel, for which the grand jury had issued a subpoena. We conclude that principles of exception and waiver, fundamental to the work product doctrine in this context, strip two of the eight items of the protection they might otherwise deserve.

I

The following account is taken from the affidavit of one X———, an American citizen with business interests in a specific foreign country. We have excised proper names and other identifying information in order to preserve the confidentiality of grand jury proceedings, but the substance of the story X——— tells—and presumably told to the grand jury—sets the stage for the case before us:

> Shortly after the signing of the contract in [the country where X——— does business] during the first part of Oct. 1974 I received a phone call from [a senior officer at Company]. He said they were having difficulty in arranging the pay off to [the senior official of a company owned by the foreign government] and asked me if I could get them an invoice to cover it from a company I was associated with [in the foreign country]. He said that once the * * * pay off was taken care of they would then arrange for the financing I needed for my [business].
>
> I arranged for [the Company officer] to get the invoice he needed on the stationery of [the company I owned].

individuals involved in this case. We have endeavored to provide as little description as possible of the corporation and the countries involved consistent with our obligation to explain our disposition of this important case.

2. Affidavit of X——— at 3–5, Statement of Points and Authorities in Response to Motion to Quash Subpoena, at Attachment, D, *In re*

The Date for the pay off was set * * *.

> [The foreign official and a woman] arrived at my house about 9:30 AM. I left shortly after to pick up [Company's chairman] at the airport. I picked up [Company's chairman] at about 10:30 AM and as we were driving to my House he said that we had to stop first at the [Bank] & pick up the money. He said that he had a check made out to [my company] and that all I had to do was endorse it because the arrangements had already been made with the Bank. I reluctantly agreed, with considerable misgivings about entering the transaction.
>
> We arrived at the Bank where everything was ready, the money was counted out, and we left. [An associate of the chairman] was waiting in his car in front of the Bank and followed us to my House where he remained in his car. [The chairman] and I entered the House where [the woman and the official] were waiting. I placed the Briefcase containing the money on the floor. After the greetings and Handshakes [the chairman] picked up the Briefcase and opened it and said, "Here's your 200 thousand. We counted it at the Bank but we can count it again if you want." [The Chairman] then proceeded to count the money. [The official] said no, it's not necessary. [The chairman] then closed the Briefcase and handed it to the official].[2]

X———'s account of this transaction is, of course, just one of many that have emerged in three successive investigations of Company's business practices and candor. The current grand jury investigation follows separate investigations by the Internal Revenue Service (IRS) and the Securities and Exchange Commission (SEC), during which Company and its officers had many opportunities to tell their version of this story.

*Subpoena Issued in Grand Jury Investigation of Possible Violations of 18 U.S.C. § 371, 18 U.S.C. § 1001, 18 U.S.C. §§ 1503, 1505, 1510, 31 U.S.C. 1056 et seq.,* D. D.C. Misc. No. 80–0046 (filed March 21, 1980). The original District Court proceeding in this case will be cited hereinafter simply as *In re Subpoena.*

The documents at issue in this case come from the files of Company's former senior vice president and general counsel, Y_____, and they concern both the matters under investigation and the investigations themselves.

### A. *The IRS Investigation*

On April 7, 1976 the IRS announced a broad effort to uncover tax evasion by large corporations that had failed to account adequately for bribes, "slush funds," and other practices that might have led to inaccurate computation of their tax liabilities.[3] The IRS instructed the examiners in its Large Case Audit Program to ask top executives in a number of large corporations a series of questions relating to such practices. All questions were to be answered in affidavits, under oath, and signed by the officers to whom they were directed.[4]

Shortly thereafter IRS examiners in the city where Company's headquarters are located propounded a list of 19 questions to several of Company's officers, including Company's chairman (who is also its chief executive officer) and the officers responsible for its foreign operations. The Company officers each submitted their affidavits to the IRS in June or July of 1976.

In response to one of the IRS questions concerning bribes or "kickbacks" paid to officials of foreign governments, Company's chairman stated:

> The Company, directly or through its subsidiaries or affiliates, retained various persons to act as finders, consultants or sales agents with respect to possible acquisitions and to doing business * * * in and with various foreign countries. * * * To the best of my knowledge, the pay-

ments referred to above were not bribes, kickbacks or other such payments to obtain favorable treatment in securing business or otherwise to obtain special concessions, or to pay for favorable treatment for business secured or for special concessions already obtained.[5]

The chairman appended a list of "finders" that Company had employed between 1971 and 1976 and the fees paid them. Most of the finders' fees had been paid in connection with the acquisition of relatively small operating companies or properties, almost exclusively in the United States. However, the chairman's list of finders' fees also included two substantial payments to companies associated with X_____. According to the chairman's list, this fee was paid in connection with acquisition of certain contracts in the foreign country where one of X_____'s companies was incorporated, and the fee had involved two separate transactions, a $200,000 payment by check to the foreign company and a $200,000 loan guarantee in favor of a second company owned by X_____.[6]

One of Company's vice presidents, who had responsibility for its operations in the country where X_____ did business, also responded to the IRS question concerning bribes and kickbacks. This man—the same person who according to X_____ arranged the "pay off" at X_____'s house—submitted an answer and a list of finders substantially identical to those submitted by Company's chairman. He also submitted a list of "consultants" and their fees, which showed that one Z_____ had been paid $120,000 in 1974 with regard to unspecified

---

3. *See* Herlihy & Levine, *Corporate Crisis: The Overseas Payment Problem*, 8 Law & Policy in Int'l Bus. 547, 597 (1976). The IRS's activities in this area, however, date back to its investigation of the tax consequences of illegal campaign contributions uncovered by the Watergate Special Prosecutor in 1973. In 1975 the IRS issued an Internal Revenue Manual Supplement entitled "Corporate Slush Funds." *See* Dunn, *Questionable Payments: A Consideration of Certain Specific Issues and a Current Overall Evaluation*, 36th Annual N.Y.U. Institute of Federal Taxation 1309, 1310 (1978).

4. *See* Dunn, *supra* note 3, at 1310–1311; Herlihy & Levine, *supra* note 3, at 597–598.

5. Affidavit of Company chairman and chief executive officer, at 1, Statement of Points and Authorities in Response to Motion to Quash Subpoena, at Attachment B, *In re Subpoena, supra* note 2 (filed March 21, 1980) (footnote omitted).

6. *Id.* at Attachment FINDERS.

"Business Opportunities" in a particular region.[7]

Several of the IRS questions concerned payments to political figures and government officials in the United States. With respect to these, Company's chairman stated:

> Several Company officers were requested to make and made election campaign contributions to various candidates in the United States. In connection with contributions aggregating approximately $5,000, officers received advances from, or were reimbursed by, the Company. I have been advised that all of such advances have been repaid to the Company.[8]

The vice president, however, gave the IRS a substantially different statement under oath. He admitted that he had made political contributions totalling $1,400 and received an advance from Company to cover them. He confirmed that he had repaid the advance. But after he repaid the advance he was reimbursed a second time for the contributions, by means of expense account manipulation.[9]

### B. *The SEC Investigation*

Several months later, while the IRS investigation of Company was still pending, the SEC began an informal investigation of Company's activities that later escalated into a formal investigation and enforcement action. In the informal portion of its investigation the SEC used an innovative technique known as the "voluntary disclosure program" to induce Company to investigate and reform itself, thus saving the government the considerable expense of a full-scale investigation and prosecution. Because the SEC's program significantly affects our view of the work product privilege, we relate its background in some detail.

As early as 1974 the SEC was engaged in investigating the political "slush fund" practices of some corporations. Initially the SEC staff carried out its own investigations, but as the scope of the payments problem became apparent, extending to foreign as well as domestic payments, the SEC realized that it did not have the resources to investigate each case carefully.[10] In several 1974 enforcement actions, the SEC thus sought and obtained consent decrees in which corporate defendants agreed to appoint special committees of their boards of directors—composed entirely of directors unaffiliated with management—to carry out independent investigations of the defendants' payments practices. These investigations were to be performed by outside counsel hired for that purpose and responsible only to the special committee. The results of the investigation would be embodied in a report to the special committee, which would also be shared with the SEC staff.[11]

As the benefits of this method of investigation became apparent, the SEC began to encourage corporations to come forward voluntarily and perform the same type of independent investigation that the consent decrees had required.[12] This effort to induce corporate self-investigation became known as the voluntary disclosure program.

---

**7.** Affidavit of W———— and Attachment SCHEDULE OF FINDERS AND CONSULTANTS, Statement of Points and Authorities in Response to Motion to Quash Subpoena, at Attachment C, *In re Subpoena, supra* note 2 (filed March 21, 1980).

**8.** Affidavit of Company chairman and chief executive officer, *supra* note 5, at 3.

**9.** Affidavit of W————, *supra* note 7, at 4–5.

**10.** *See* Herlihy & Levine, *supra* note 3, at 577–579; *Abuses of Corporate Power: Hearings Before the Subcommittee on Priorities and Economy in Government of the Joint Economic*

*Committee,* 94th Cong., 1st & 2d Sess. 23 (1976) (testimony of R. Hills, Chairman, SEC) (hereinafter cited as *JEC Hearings*).

**11.** *See generally* Report of the Securities and Exchange Commission on Questionable and Illegal Corporate Payments and Practices Submitted to the Senate Committee on Banking, Housing and Urban Affairs, 94th Cong., 2d Sess. (1976) (hereinafter cited as Report); Herlihy & Levine, *supra* note 3, at 581–582.

**12.** *See* Report, *supra* note 11, at 6–7; Herlihy & Levine, *supra* note 3, at 581–582.

The SEC publicized its program in a number of forums,[13] and SEC Chairman Roderick Hills gave an extended description of the program to the Joint Economic Committee of Congress in March 1976.[14] As described by Hills, participation in the program entailed four major steps. First, a corporation's board of directors should declare an end to all payments of doubtful legality and practices involving maintenance of inaccurate books and records. Second, the board should authorize a special committee composed primarily of independent directors to perform a thorough investigation of the corporation's practices, using independent counsel and auditors to prepare a report for the full board. Third, information on the commencement and progress of the investigation should be lodged with the SEC on its Form 8–K, and a copy of the final report should be filed with the SEC. Fourth, "[i]t must be understood that the staff of the Commission will have access to any information that is discovered or developed during the investigation."[15] In return for such corporate cooperation, the SEC offered leniency for past abuses and a chance to avoid extended formal investigation and litigation. A report filed with the Senate Banking Committee in May 1976 provided details of roughly 60 corporations' compliance with the voluntary disclosure program.[16]

The voluntary disclosure program was well developed by early 1977, when the staff of the SEC contacted Company and suggested that it make use of the voluntary method to clear the air about any payments of questionable legality in the United States or abroad. Accordingly, Company's board of directors retained a large law firm to act as special investigative counsel and set up a special committee of independent directors to oversee the investigation. During the summer of 1977 lawyers from the firm examined hundreds of documents in Company's files and interviewed 52 persons, all officers, directors, employees, or consultants hired by Company.

In May 1978 the investigative counsel submitted its final report to the special committee.[17] Although the identities of persons outside Company and the names of

13. Commissioner Loomis described the program in congressional hearings in 1975. *See Hearings on the Activities of American Multinational Corporations Before the Subcommittee on International Economic Policy of the House Committee on International Relations*, 94th Cong., 1st Sess. 180–187 (1975) (testimony of P. Loomis, Commissioner, SEC). Commissioner Sommer spoke before a conference of state securities commissioners in July 1975. *See* Herlihy & Levine, *supra* note 3, at 585 & n.210. The topic was also discussed extensively at the Practising Law Institute's annual institutes on securities law, with Stanley Sporkin, director of the SEC's Enforcement Division, providing the position of the SEC. *See* Henderson & Sommer, *Sensitive Corporate Payments: The SEC's Voluntary Disclosure Program*, Eighth Annual Institute on Securities Regulation 423 (PLI 1976). *See also* Block & Barton, *Internal Corporate Investigations: Maintaining the Confidentiality of a Corporate Client's Communications With Investigative Counsel*, 35 Bus.Law. 5 (1979); Brodsky, *The "Zone of Darkness": Special Counsel Investigations and the Attorney-Client Privilege*, 8 Sec.Reg.L.J. 123 (1980); Coffee, *Beyond the Shut-Eyed Sentry: Toward a Theoretical View of Corporate Misconduct and an Effective Legal Response*, 63 Va.L.Rev. 1099 (1977); Herlihy & Levine, *supra* note 3; Note, *Disclosure of Payments to Foreign Government Officials Under the Securities Acts*, 89 Harv.L.Rev. 1848 (1976); Note, *Discovery of Internal Corporate Investigations*, 32 Stan.L.Rev. 1163 (1980).

14. *JEC Hearings, supra* note 10. Chairman Hills also testified before a Senate committee in May 1976. *Prohibiting Bribes to Foreign Officials: Hearing Before the Senate Committee on Banking, Housing and Urban Affairs*, 94th Cong., 2d Sess. (1976) (hereinafter cited as *Senate Hearing*).

15. *Id.* at 9–10; *see id.* at 23 (testimony of S. Sporkin, Director, SEC Enforcement Division): "[T]he thing that the program has as a key part is that * * * when the final report comes in, we will have access to both the report and the underlying data." *See also Senate Hearing, supra* note 14, at 20, 27 (testimony of R. Hills); notes 108–112 *infra* and accompanying text.

16. Report, *supra* note 11. A summary of the report appears at [1975–1976 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 80,600. .

17. *See* brief for appellants at 9; Report of [A_____ & B_____] to Special Committee of the Board of Directors, May 8, 1978, *In re Subpoena, supra* note 2 (filed Dec. 4, 1981) (hereinafter cited as Final Report).

foreign nations were disguised by a code, the report disclosed in detail questionable business practices in six countries.

Of particular relevance here is the report's discussion of Company's dealings with X———. The full discussion is quite lengthy, but we summarize its high points: According to the report, the finder's fee arrangement with X——— was never reduced to writing. In October 1974 Company issued a check for $200,000 to X———'s company. Company's chairman then flew halfway across the continent to hand-deliver the check to X———, on a day when he knew the foreign official—whose jurisdiction included valuable property owned by Company—would be visiting X———. The chairman met X——— at a bank office where the check was cashed by X——— "with the assistance" of Company's chairman. The two men then drove to X———'s home, where they met with the official and a woman friendly with both X——— and the official.[18]

Approximately one month later Company's board of directors authorized a $200,000 loan guarantee to another company owned by X———. The report also disclosed that there had been little or no investigation of the company in favor of which the guarantee was executed. In fact, it had been suspended as a corporation in good standing by its state of incorporation. The guaranteed loan was never repaid.[19] Company also paid small consulting fees to the woman involved from time to time over the next few years.[20]

The investigative counsel's report concludes its discussion of the X——— episode with a disclaimer:

> No directors, officers or employees of the Company interviewed by us expressed any knowledge that either the $200,000 payment to [X———] or the proceeds of the loan guaranteed by [Company] were used in any way to benefit personally any public officials of the foreign country * *. Nevertheless, we believe that the manner and circumstances of payment and the participation therein of the Chairman of the Board * * * raise questions of irregularity which we have not been able to resolve satisfactorily, particularly in light of our inability to interview [X———].[21]

Nevertheless, the report does not explain why the lawyers performing the investigation were not able to interview X———. Neither does it explain what X——— might have done to earn $400,000, except to note that some Company officers were introduced to a number of officials of the foreign government involved (including its President) through a person whom the woman "claimed as a distant relative."

The investigative counsel's report also contains a section on domestic political contributions. It states:

> In 1972, the Chairman of the Board * * asked the President * * * to communicate to a few other officers a request that such other officers make campaign contributions to various candidates for federal offices, and to inform them that they could recover the total amount of their contributions by means of requests for reimbursement on their monthly Company expense accounts. As a result of such request, seven officers * * * made contributions. However, only two officers * * have stated that they were reimbursed for such contributions * * *. * * * [T]hese disbursements would appear to have violated the provisions of applicable federal election laws.[22]

When the report was complete, a copy was given to the SEC. Company also provided the SEC staff access to a number of black three-ring binders containing all of the extensive, uncoded notes taken by the lawyers during their interviews as well as

---

**18.** Final Report, *supra* note 17, at 24 -25.

**19.** *Id.* at 25.

**20.** *Id.* at 26. *See also* Affidavit of W———, *supra* note 7, at Attachment SCHEDULE OF FINDERS AND CONSULTANTS.

**21.** Final Report, *supra* note 17, at 26.

**22.** *Id.* at 36.

corporate records and documents selected by the lawyers as particularly relevant to the report.[23] Eventually the SEC subpoenaed these notebooks, and Company furnished copies to the SEC without objection. SEC staff also examined Company's files not included in the notebooks at Company's headquarters. In this process the staff uncovered evidence of possible bribery in a seventh country, not discussed in the report, carried out through Company's "consultant" Z_____.[24]

On the basis of the report, notes, and other material gathered in its investigation, the SEC filed a civil complaint against Company. The complaint alleged violations of the securities laws in connection with Company's dealings in three foreign countries, including the dealings with X_____ and Z_____. Without admitting guilt, Company entered into a consent decree with the SEC on the day the complaint was filed. The SEC also reported the case to the Department of Justice for investigation of possible criminal violations.

## C. The Grand Jury Investigation and Subpoena

In October 1978 a grand jury was convened in the District of Columbia to consider indictment of Company and those connected with it. The record in this case discloses the type of criminal violation under investigation by the grand jury:[25] conspiracy to defraud the government,[26] providing false information to a government agency,[27] and various types of obstruction of justice.[28]

Within a few weeks the grand jury subpoenaed and received, without objection by Company, copies of the material that had previously been received by the SEC. The grand jury also heard testimony from a number of present and former Company employees, as well as from X_____ and the foreign government official to whom the October 1974 payment may have been made.[29]

In December 1979 the grand jury directed a subpoena *duces tecum* to Y_____, who had been Company's in-house general counsel from 1971 to August 1978 (approximate-

---

**23.** *See* brief for appellants at 9–10; Grand Jury Testimony of Robert Adams, SEC Attorney, at 12–14, Statement of Points and Authorities in Response to Motion to Quash Subpoena, at Attachment H, *In re Subpoena, supra* note 2 (filed March 21, 1980).

**24.** *See* Grand Jury Testimony of Robert Adams, *supra* note 23, at 13. The civil complaint filed by the SEC against Company reveals that the SEC had found some reason to suspect that Z_____ was involved in questionable payments, since one count of the complaint charged specific improprieties concerning Z_____. Yet the investigative counsel's final report does not provide any information about Company's involvement with Z_____. Adams stated before the grand jury that SEC investigators had discovered a memorandum concerning a country in which Z_____ operated in a file made available to the SEC but not part of the notebooks turned over to the SEC.

**25.** All of the captions on official grand jury documents, including the subpoenas issued to Y_____ and Company's attorneys, identify which crimes the grand jury has under investigation.

**26.** 18 U.S.C. § 371 (1976):
If two or more persons conspire * * * to defraud the United States, or any agency

thereof[,] in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined not more than $10,000 or imprisoned not more than five years, or both. *See* note 92 *infra.*

**27.** 18 U.S.C. § 1001 (1976):
Whoever, in any matter within the jurisdiction of any department or agency of the United States[,] knowingly and willfully falsifies, conceals or covers up by any trick, scheme, or device a material fact, or makes any false, fictitious or fraudulent statements or representations, or makes or uses any false writing or document knowing the same to contain any false, fictitious or fraudulent statement or entry, shall be fined not more than $10,000 or imprisoned. not more than five years, or both.

**28.** 18 U.S.C. § 1503 (1976) (influencing or injuring officer, juror, or witness); *id.* § 1505 (obstruction of proceedings before departments, agencies, and committees); *id.* § 1510 (obstruction of criminal investigations). *See also* note 92 *infra.*

**29.** *See* Affidavit of X_____, *supra* note 2, at 2–3.

ly three months after the investigative counsel's final report was issued).[30] Y_____ appeared before the grand jury on January 15, 1980. He answered a number of questions concerning matters which he had discussed in a formal interview with the investigating lawyers during Company's voluntary investigation, the contents of which were summarized in great detail in the notes that had been provided to the grand jury.[31] With respect to the grand jury's request for documents, he stated that he had discovered 38 documents in his possession responsive to the subpoena. He explained that these files really belonged to Company and that, after consultation with the attorneys then representing Company, he had turned over the 38 documents to one of the lawyers then representing Company

in connection with the grand jury investigation.[32] Shortly thereafter the grand jury issued a subpoena to that lawyer for the material he had received from Y_____.

The lawyer and Company both moved to quash the subpoena on the ground that the 38 documents were protected by attorney-client and work product privilege. After inspecting the documents *in camera* the District Court granted the motion to quash for all but eight specific portions of the documents, as to which it held that Company had waived both attorney-client and work product privileges.[33] Company sought review of the District Court's order in this court, but we dismissed the appeal because mere denial of a motion to quash was not appealable until the person in possession of the documents had refused to produce them

---

**30.** *See* Statement of Points and Authorities in Support of Motion to Quash Subpoena, Exhibit I, *In re Subpoena, supra* note 2 (filed March 7, 1980). The subpoena stated:

> BRING WITH YOU the originals of any and all records, files, agreements, reports, memoranda, correspondence, tapes, transcriptions, notes, telexes, or other communications, documents, book or log entries, notes of conversations, meetings or conferences generated by or for you directly or indirectly in your possession or subject to your control pertaining to: * * *
>
> * * * * * *
>
> 1. a. [An investigation of Company performed by a large law firm];
> b. [An investigation of Company performed by the Securities and Exchange Commission];
> c. [An investigation of Company performed by the Internal Revenue Service]; or
> d. Your own investigation of [Company] or any of its subsidiaries and related entities for the period January 1, 1973 to the present.
> 2. The termination of your employment with [Company].

**31.** *See* Grand Jury Testimony of Y_____, Statement of Points and Authorities in Response to Motion to Quash Subpoena, at Attachment E, *In re Subpoena , supra* note 2 (filed March 21, 1980). Y_____ testified at length about the meetings described in Document 2, *see* p. 805 *infra*. The formal interviews between Y_____ and the lawyers from the firm acting as investigative counsel took place on July 5, 6, and 7, 1977, with brief follow-up sessions on July 11 and 15. Two of the lawyers present took ex-

tensive notes of the principal sessions; they will be cited hereinafter as "Interview Notes."

**32.** *See* brief for the United States at 5 & n.1.

**33.** *In re Subpoena, supra* note 2 (July 16, 1980). The basic rationale that the District Court gave for its order was that Company had waived its work product and attorney-client privileges as to the eight items identified by the court. The District Court's waiver analysis proceeded negatively, rejecting all of Company's arguments as to why the court should not find waiver. In general, the court's final holding was based on two lines of reasoning. First, the court held that Company's prior disclosures revealed the substance of attorney-client confidences about certain questionable payments discussed in the investigative counsel's report and interview notes. Therefore, Company had waived its attorney-client privilege with respect to the payments, and the court concluded that the purposes of the work product privilege were so closely related that waiver of the attorney-client privilege should also constitute waiver of the work product privilege. *Id.* at 12–13. Second, the District Court found that the report and notes did not contain the same wealth of relevant detail as the documents under subpoena in this case. The court characterized the version of the facts that appeared in the report as an "enchanted * * * tale," *id.* at 10, and it went on to state, "This kind of selective waiver is precisely the kind of manipulation and sl[e]ight-of-hand that led to the waiver doctrine in the first place." *Id.* at 11. The District Court also rejected the government's argument that all of the documents under subpoena came within the "crime-fraud" exception to both privileges. *See* notes 79–81 *infra* and accompanying text.

before the grand jury and received a citation and sentence for contempt of court.[34]

By this point the original grand jury's term had expired, and Company had retained a new law firm to represent it in connection with the grand jury investigation. The 38 documents had passed into the hands of a partner in the new law firm, and, in due course, a new grand jury issued a subpoena for the documents addressed to their current possessor. The District Court denied Company's motion to quash in a brief order that referred to its prior opinion; when the lawyer holding the documents indicated his unwillingness to produce them before the grand jury, the District Court held him in contempt and sentenced him to confinement until he produced the eight unprivileged items.[35]

### D. The Documents

All of the 38 documents that come within the terms of the subpoenas in this case come from Y_____'s files for the years 1976 through 1978. All but two of the documents were dictated or handwritten by Y_____, the exceptions being a very brief telex message sent to Y_____ from an officer in one of Company's foreign subsidiaries and a handwritten list prepared for Y_____ by an auditor employed by Company.

Six of the 38 documents date from June 1976, while Y_____ was involved in accumulating information relevant to the IRS questions and in counseling Company's officers on how they should respond to the questions. Of these six documents, the District Court ordered that substantial portions

of two, numbered 2 and 3, be produced before the grand jury. Document No. 2 is a transcript of a casette tape dictated by Y_____ to preserve his recollection of a series of meetings in late May and early June, at which Company's chairman, president, and several officers discussed both its dealings with X_____ and the campaign contribution reimbursement issue, as well as how the affidavits to be submitted to the IRS should deal with these subjects. Document No. 3 is a typed memorandum recording the substance of a telephone conversation between Y_____ and two of Company's' outside counsel. In this conversation, which took place two days after Y_____ recorded the tape described above, the three lawyers discussed X_____ and the campaign contribution issue.

The remaining 32 documents were generated by Y_____ during the voluntary investigation and preparation of the investigative counsel's final report, in 1977 and early 1978. Twelve of these are in fact pages from Y_____'s personal desk calendar, upon which Y_____ scribbled brief notes; the remainder (with the exception of the telex) are all handwritten notes on legal-size paper. Y_____ had been designated as liaison between the special committee of Company's board of directors and the law firm performing the investigation, and most of the notes reflect conversations between Y_____ and various lawyers involved in the investigation. The District Court held that portions of six of these documents—on some, a single line of notes or less—must be produced before the grand jury.[36]

**34.** *In re Sealed Case*, 655 F.2d 1298 (D.C. Cir. 1981).

**35.** *In re Subpoena Issued in Grand Jury Investigation of Possible Violations of 18 U.S.C. § 371, 18 U.S.C. § 1001, 18 U.S.C. §§ 1503, 1505, 1510, 31 U.S.C. § 1056 et seq.*, D. D.C. Misc. No. 81 0140 (June 20, 1981).

**36.** The District Court indicated its determination that each of these items should be produced by marking the portions to be produced with a colored marking pen. With the exception of the casette tape, the District Court's opinion

does not specify why individual items had lost their privilege.

Document No. 14 is a page of legal paper covered with notes and dated August 24, 1977; the District Court held that Company must produce the first item on the page, which summarizes Y_____'s conversation with investigative counsel about their interview with one of Company's officers concerning Company's business in a foreign country, what documents the investigators should examine, and how Company should conduct its business in that country in the future. Document No. 16 is an appointment calendar page with notes appar-

The merits of the District Court's holding with respect to the eight items it ordered Company to produce before the grand jury are now before us.[37]

## II

▮ Nowhere is the public's claim to each person's evidence stronger than in the context of a valid grand jury subpoena.[38] Witnesses may not refuse to testify or produce documents before a grand jury simply because they think the grand jury's demands unreasonable. Only a very limited number of recognized privileges provide legitimate grounds for refusing to comply with a grand jury subpoena, and each of these is firmly anchored in a specific source—the Constitution, a statute, or the common law.[39] A court's power to control a grand jury's investigation is strictly circum-

scribed; it may not quash a valid subpoena for documents or refuse to enforce the subpoena with its contempt power unless the documents under subpoena come within a recognized privilege.[40]

▮ Each of the recognized privileges protects a substantial individual interest or a relationship in which society has an interest, at the expense of the public interest in the search for truth.[41] Therefore, not all socially worthy interests or relationships receive the benefits of privilege.[42] Competent authority must determine that a privilege is necessary in a particular context to protect that which society seeks to protect, and that the benefits of protecting the privileged interest outweigh the benefits of getting at the truth. Because recognition of a privilege generally precludes striking that balance on a case-by-case basis,[43] courts are

ently summarizing a report by one of the investigating lawyers about what one of the persons they interviewed—not an employee of Company—had said; it also contains brief notes relating to the tax problems associated with Company's compensation of its American employees working abroad. The District Court held that the entire document was not privileged. Document No. 21 is a page of undated notes, of which the District Court held that part of one item, which described discussions in a telephone meeting of Company's board of directors, was not privileged.

Document No. 29 is a desk calendar page with several brief notes. The District Court held only one line unprotected by privilege; it apparently summarizes a conversation with Company's president about Company's dealings with X_____. Document No. 35 is a handwritten list of matters under investigation prepared for Y_____ by one of Company's auditors. The District Court held that the bottom two-thirds of the page was not privileged. Document No. 38 is a page of cryptic notes; the District Court held that the first item—four words and a date, apparently relating to favors provided by Company to a politician from the state where it is located—was not privileged.

**37.** The only order under appeal is the District Court's order of June 20, 1981, holding Company's agent in contempt for refusing to produce the eight items. *See In re Sealed Case, supra* note 34. Therefore, we do not consider whether the District Court should have ordered Company to produce more of the material under subpoena than just the eight items identified in its July 16, 1980 memorandum. *See also* note 83 *infra*.

**38.** *See Branzburg v. Hayes*, 408 U.S. 665, 688 & n.26, 92 S.Ct. 2646, 2660 & n.26, 33 L.Ed.2d 626 (1972) (*citing* 4 The Works of Jeremy Bentham 320–321 (J. Bowring ed. 1843)); *In re Weiss*, 596 F.2d 1185, 1186 (4th Cir. 1979) (*per curiam*).

**39.** *Branzburg v. Hayes, supra* note 38, 408 U.S. at 688, 92 S.Ct. at 2660.

**40.** *See generally id.* at 686–691, 92 S.Ct. at 2659–2661; *In re Grand Jury Proceedings (Duffy)*, 473 F.2d 840, 842–847 (8th Cir. 1973).

**41.** *See United States v. Bryan*, 339 U.S. 323, 331, 70 S.Ct. 724, 730, 94 L.Ed. 884 (1950).

**42.** *See, e.g., Herbert v. Lando*, 441 U.S. 153, 99 S.Ct. 1635, 60 L.Ed.2d 115 (1979) (editorial decisions not privileged); *Branzburg v. Hayes, supra* note 38 (no press privilege from grand jury testimony); *Couch v. United States*, 409 U.S. 322, 335, 93 S.Ct. 611, 619, 34 L.Ed.2d 548 (1973) (refusing to recognize an accountant-client privilege in the context of tax returns and related criminal investigations); Chafee, *Privileged Communications: Is Justice Served or Obstructed by Closing the Doctor's Mouth on the Witness Stand?*, 52 Yale L. J. 607 (1943) (physician-patient privilege not universally accepted, not well designed for social purpose of protecting the physician-patient relationship).

**43.** "Privilege paints with a broad brush. Reconciling interests in privacy and confidentiality with the needs of litigants is not readily achieved in terms of broad categories; it calls for the finer touch of the specific solution." C.

careful to construe recognized privileges narrowly [44] and to adopt new privileges with extreme caution.[45]

Nevertheless, even though privileges usually provide categorical protection, two common law doctrines give courts a limited ability to make sure that privileges do not serve ends for which they were not intended. These doctrines are *exception* and *implied waiver.* Exception comes into play when a privileged relationship is used to further a crime, fraud, or other fundamental misconduct. The leading case on exception, *Clark v. United States,*[46] expresses the doctrine's basic principle: "A privilege surviv[es] until the relation is abused and vanish[es] when abuse is shown to the satisfaction of the judge * * *."[47] Implied waiver deals with an abuse of a privilege itself rather than of a privileged relationship. Where society has subordinated its interest in the search for truth in favor of allowing certain information to remain confidential, it need not allow that confidentiality to be used as a tool for manipulation of the truth-seeking process. Dean Wigmore has stated the basic doctrine with respect to implied waiver:

> [R]egard must be had to the double elements that are predicated in every waiver, i.e., not only the element of implied intention, but also the element of fairness and consistency. A privileged person would seldom be found to waive, if his intention not to abandon could alone control the situation. There is always also the objective consideration that when his conduct touches a certain point of disclosure, fairness requires that his privilege shall cease whether he intended that result or not. He cannot be allowed, after disclosing as much as he pleases, to withhold the remainder. * * * [48]

Thus, as an initial proposition: when a grand jury issues a valid subpoena for documents, they must be produced unless protected by a recognized privilege. If privileged, they need not be produced unless

McCormick, Handbook of the Law of Evidence § 77 at 159 (E. Cleary ed. 1972). Yet in many situations some form of categorical protection is necessary to accomplish the social goal for which the privilege is fashioned, *i.e.,* inducing one group to place its confidence in another. Therefore, the law provides specific solutions only at the periphery, where some abuse of the privilege or the privileged relationship is reasonably clear, and denying the privilege on fact-specific grounds will not engender a loss of confidence in those whose dealings are honest and aboveboard.

**44.** *See, e.g., In re Grand Jury Investigation (Sun. Co.),* 599 F.2d 1224, 1235 (3d Cir. 1979) (attorney-client privilege must be "strictly confined within the narrowest possible limits consistent with the logic of its principle").

**45.** *See Herbert v. Lando, supra* note 42, 441 U.S. at 175, 99 S.Ct. at 1648. Congress has preferred to leave to the courts questions of which privileges to recognize and when to apply them. In 1975 Congress adopted Rule 501 of the Federal Rules of Evidence, which provides that "the privilege of a * * * person * * shall be governed by the principles of the common law as they may be interpreted by the courts of the United States in the light of reason and experience." In adopting Rule 501 Congress rejected a set of rules proposed by the Supreme Court that would have codified the law of privileges, including the work product privilege. The Senate Judiciary Committee

explained, "It should be clearly understood that, in approving this general rule as to privileges, the action of Congress should not be understood as disapproving any recognition of * * * the enumerated privileges contained in the Supreme Court rules. Rather, our action should be understood as reflecting the view that the recognition of a privilege based on a confidential relationship and other privileges should be determined on a case-by-case basis." S.Rep. No. 1277, 93d Cong., 2d Sess. (1974), *reprinted in* 28 U.S.C. app. at 557–558 (1976).

**46.** 289 U.S. 1, 53 S.Ct. 465, 77 L.Ed. 993 (1933).

**47.** *Id.* at 16, 53 S.Ct. at 470 (with regard to attorney-client privilege and privilege for jury deliberations). *See also id.* at 13: "[R]ecognition of a privilege does not mean that it is without conditions or exceptions. The social policy that will prevail in many situations may run foul in others of a different social policy, competing for supremacy."

**48.** 8 J. Wigmore, Evidence in Trials at Common Law § 2327 at 636 (J. McNaughton rev. 1961); *see Weil v. Investment/Indicators, Research & Management, Inc.,* 647 F.2d 18, 24 (9th Cir. 1981); *In re Grand Jury Investigation of Ocean Transportation,* 604 F.2d 672, 675 (D.C. Cir. 1979).

the privileged relation from which they derive was entered into or used for corrupt purposes or unless an "objective consideration" of fairness requires disclosure to prevent undue manipulation of the privilege.

Company has argued that two privileges excuse its agent from producing any part of Y_____'s files before the grand jury: the attorney-client privilege, and the work product privilege. Both are common law privileges in the context of a federal grand jury, although versions of the work product privilege are found in the Federal Rules of Civil and Criminal Procedure, which may be consulted for guidance as to its scope.[49] The two privileges are closely related. In England courts do not completely distinguish between them,[50] and both have the same basic purpose: to "promote broad[ ] public interests in the observance of law and the administration of justice." [51]

■■ To the extent that they overlap, the work product privilege is the broader of the two.[52] The attorney-client privilege

---

**49.** Federal Rule of Civil Procedure 26(b)(3) extends the protection from discovery offered by the work product doctrine to "documents and tangible things * * * prepared in anticipation of litigation or for trial by or for another party or by or for that other party's representative (including his attorney, consultant, surety, indemnitor, insurer, or agent)" and provides that such material may be subject to discovery "only upon a showing that the party seeking discovery has substantial need of the materials in the preparation of his case and that he is unable without undue hardship to obtain the substantial equivalent of the materials by other means." Furthermore, "the court shall protect against disclosure of the mental impressions, conclusions, opinions, or legal theories of an attorney or other representative of a party concerning the litigation."

Federal Rule of Criminal Procedure 16(b)(2) states that "this subdivision does not authorize the discovery or inspection of reports, memoranda, or other internal defense documents made by the defendant, or his attorneys or agents[,] in connection with the investigation or defense of the case * * *."

There is some uncertainty as to the precise status of Rule 26(b)(3) in this case. Federal Rule of Civil Procedure 81(a)(3) makes the Federal Rules applicable to "proceedings to compel the giving of testimony or production of documents in accordance with a subpoena issued by an officer or agency of the United States * *." Few cases address the meaning of Rule 81 for proceedings to enforce grand jury subpoenas, but as a general proposition it seems to apply in that context. *See, e.g., In re Grand Jury Subpoena Duces Tecum Issued to First Nat'l Bank of Md.,* 436 F.Supp. 46, 48 (D. Md. 1977). The Supreme Court has held that Rule 81 makes the Federal Rules applicable to proceedings to enforce IRS summonses, *see Donaldson v. United States,* 400 U.S. 517, 91 S.Ct. 534, 27 L.Ed.2d 580 (1971), a context roughly analogous to proceedings to enforce grand jury subpoenas, although more certainly within the language of Rule 81.

In *Upjohn Co. v. United States,* 449 U.S. 383, 398 399, 101 S.Ct. 677, 687, 66 L.Ed.2d 584 (1981), the Court seemed to assume, without firmly holding, that Rule 26(b)(3) rather than the common law restricted the scope of the IRS's power to summons work product. *But cf. United States v. Moon,* 616 F.2d 1043, 1047 (8th Cir. 1980) (discovery not normally available in summons enforcement proceedings). But it is not clear that Rule 26, which by its terms applies only to discovery, should govern non-discovery applications of the work product privilege. A better interpretation might be that the Federal Rules dictate the procedures to be applied in proceedings to enforce IRS summonses, or grand jury subpoenas, but that Rule 26 does not in itself supply a substantive restriction on what the IRS or a grand jury may seek to obtain by compulsory process. *See In re Grand Jury Subpoena (John Doe, Inc.),* 599 F.2d 504, 509 (2d Cir. 1979); Fed.R.Evid. 1101(d)(2).

In any event, Rule 26(b)(3) does not preclude application of the exception or waiver doctrines in this context. *See* cases cited in note 67 *infra; cf. United States v. Nobles,* 422 U.S. 225, 239, 95 S.Ct. 2160, 2170, 45 L.Ed.2d 141 (1975) (Fed.R.Crim.P. 16(b)(2) does not preclude waiver of work product protection).

**50.** *See* 8 J. Wigmore, *supra* note 48, § 2318 at 620–621 & n.3; 2 E. Daniell, A Treatise on the Practice of the High Court of Chancery *58– *61 (Harrisburg 1846).

**51.** *Upjohn Co. v. United States, supra* note 49, 449 U.S. at 389, 101 S.Ct. at 682 (referring to attorney-client privilege); *cf. Hickman v. Taylor,* 329 U.S. 495, 511, 67 S.Ct. 385, 393, 91 L.Ed. 451 (1947) (work product doctrine designed to further "the interests of clients and the cause of justice"); *id.* at 514–515, 67 S.Ct. at 395 (Jackson, J., concurring) (lawyer and law office deserve protection because they are "indispensable parts of our administration of justice").

**52.** *See United States v. Nobles, supra* note 49, 422 U.S. at 238 n.11, 95 S.Ct. at 2170 n.11; *In re Special September 1978 Grand Jury (II),* 640 F.2d 49, 62 (7th Cir. 1980).

covers only confidential communications between attorney and client, and it focuses on the attorney-client relationship. Thus, information other than "communications," or communications that do not involve both attorney and client, are unprotected.[53] Furthermore, any voluntary disclosure by the client to a third party breaches the confidentiality of the attorney-client relationship and therefore waives the privilege, not only as to the specific communication disclosed but often as to all other communications relating to the same subject matter.[54]

▮ The work product privilege, on the other hand, is not limited to communications. At the very least, it applies to material "obtained or prepared by an adversary's counsel" in the course of his legal duties, provided that the work was done "with an eye toward litigation."[55] The work product privilege protects both the attorney-client relationship and a complex of individual interests particular to attorneys that their clients may not share.[56] And because it looks to the vitality of the adversary system rather than simply seeking to preserve confidentiality, the work product privilege is not automatically waived by any disclosure to a third party.[57]

▮ The seminal case for the modern work product privilege is *Hickman v. Taylor*, 329 U.S. 495, 67 S.Ct. 385, 91 L.Ed. 451 (1947). In *Hickman* the Supreme Court read into the Federal Rules of Civil Procedure then in effect a two-tiered protection from discovery for attorney work product, in order to accommodate the liberal deposition-discovery policies of the Rules and the need to provide confidentiality for attorneys' files.[58] To the extent that work product contains relevant, nonprivileged facts, the *Hickman* doctrine merely shifts the standard presumption in favor of discovery and requires the party seeking discovery to show "adequate reasons" why the work product should be subject to discovery.[59] However, to the extent that work product reveals the opinions, judgments, and thought processes of counsel, it receives

---

**53.** *See generally* 8 J. Wigmore, *supra* note 48, §§ 2306–2310; 8 C. Wright & A. Miller, Federal Practice and Procedure § 2017 at 137–138 (1970).

**54.** *See Weil v. Investment/Indicators, Research & Management, Inc.,* supra note 48, 647 F.2d at 25; *United States v. AT&T Co.,* 642 F.2d 1285, 1299 (D.C. Cir. 1980); 8 C. Wright & A. Miller, *supra* note 53, § 2016 at 127. *See also* 8 J. Wigmore, *supra* note 48, § 2327 at 638 ("The client's offer of his own or the attorney's testimony as to a *specific communication* to the attorney is a waiver as to all other communications to the attorney on the same matter.") (emphasis in original). Courts apparently retain discretion not to impose full waiver as to all communications on the same subject matter where the client has merely disclosed a communication to a third party, as opposed to making some use of it. *See Weil, supra,* 647 F.2d at 25. There is no waiver if the disclosure is not voluntary. *Transamerica Computer Co. v. IBM Corp.,* 573 F.2d 646, 651 (9th Cir. 1978).

**55.** *Hickman v. Taylor, supra* note 51, 329 U.S. at 511, 67 S.Ct. at 393; *cf.* Fed.R.Civ.P. 26(b)(3); note 49 *supra.*

**56.** *Hickman v. Taylor, supra* note 51, the leading case on work product protection, identifies a complex of interrelated interests that the work product doctrine seeks to protect. They range from clients' interests in obtaining good legal advice, undistorted by mechanisms to avoid discovery, to the interests of attorneys in their own intellectual product. *See* 329 U.S. at 511, 67 S.Ct. at 393; *id.* at 516, 67 S.Ct. at 396 (Jackson, J., concurring). Courts have often recognized that the interests of attorneys and those of their clients may not always be the same. To the extent that the interests do not conflict, attorneys should be entitled to claim privilege even if their clients have relinquished their claims. *See In re Special September 1978 Grand Jury (II), supra* note 52, 640 F.2d at 63; *In re Grand Jury Proceedings (FMC Corp.),* 604 F.2d 798, 801 & n.4 (3d Cir. 1979).

**57.** *United States v. AT&T Co., supra* note 54, 642 F.2d at 1299. *See also Duplan Corp. v. Deering Milliken, Inc.,* 540 F.2d 1215, 1222 (4th Cir. 1976).

**58.** *See Hickman v. Taylor, supra* note 51, 329 U.S. at 512, 67 S.Ct. at 394.

**59.** *Id.* Rule 26(b)(3) expresses *Hickman's* "adequate reasons" standard as requiring that the party seeking discovery show "substantial need" and inability to obtain the substantial equivalent of the information in the work product from other sources without "undue hardship." *See* note 49 *supra.*

some higher level of protection, and a party seeking discovery must show extraordinary justification.[60]

The *Hickman* Court, however, scrupulously avoided recognizing a general privilege for work product.[61] The specific balance struck by *Hickman* depends largely on the function of discovery in civil litigation and the role of the trial judge in supervising discovery.[62] Thus, while *Hickman*'s balancing approach and statement of fundamental judicial policy clearly apply beyond the context of civil discovery, *Hickman* left elaboration of its work product doctrine in other contexts to later cases.[63]

In recent years the Supreme Court has recognized a privilege for work product in criminal discovery and in the context of IRS tax-investigation subpoenas.[64] And, in *In re Grand Jury Proceedings (Duffy)*, 473 F.2d 840 (8th Cir. 1973),[65] the Eighth Circuit recognized a privilege to protect attorney work product from subpoena by a grand jury. The cases extending the *Hickman*

**60.** 329 U.S. at 513, 67 S.Ct. at 394; *see Upjohn Co. v. United States, supra* note 49, 449 U.S. at 401, 101 S.Ct. at 688 ("such work product cannot be disclosed simply on a showing of substantial need and inability to obtain the equivalent without undue hardship"); Fed.R.Civ.P. 26(b)(3).

**61.** *See generally* 8 C. Wright & A. Miller, *supra* note 53, § 2022. The Court of Appeals in *Hickman* had held that the "work product of the lawyer" came within the attorney-client privilege. *See Hickman v. Taylor*, 153 F.2d 212, 223 (3d Cir. 1945). Although the Supreme Court affirmed unanimously, it expressly rejected the lower court's legal theory:

> We also agree that the memoranda, statements and mental impressions in issue in this case fall outside the scope of the attorney-client privilege and hence are not protected from discovery on that basis. It is unnecessary here to delineate the content and scope of that privilege as recognized in the federal courts. For present purposes, it suffices to note that the protective cloak of this privilege does not extend to information which an attorney secures from a witness while acting for his client in anticipation of litigation. Nor does this privilege concern the memoranda, briefs, communications and other writings prepared by counsel for his own use in prosecuting his client's case; and it is equally unrelated to writings which reflect an attorney's mental impressions, conclusions, opinions or legal theories.

329 U.S. at 508, 67 S.Ct. at 392.

**62.** In striking its balance the Court referred repeatedly to the function of discovery in private civil litigation, and the benefits of civil discovery are the consideration against which the Court weighed the need for work product protection. Thus "fact" work product

> might, under certain circumstances, be admissible in evidence or give clues as to the existence or location of relevant facts. Or [it] might be useful for purposes of impeachment or corroboration. * * *

329 U.S. at 511, 67 S.Ct. at 393. But requiring production of opinion work product or (much the same thing) answers to interrogatories seeking information that would reveal attorney thought processes

> forces the attorney to testify as to what he remembers or what he saw fit to write down regarding witnesses' remarks. Such testimony could not qualify as evidence; and to use it for impeachment or corroborative purposes would make the attorney much less an officer of the court and much more an ordinary witness.

*Id.* at 513, 67 S.Ct. at 394.

**63.** *See* 8 C. Wright & A. Miller, *supra* note 53, § 2021 at 182, § 2022 at 189–190. During the same Term that the Court decided *Hickman*, it refused to promulgate a proposed amendment to the Federal Rules of Civil Procedure that would have provided an express basis for the work product doctrine in the Rules. The proposed amendment, however, gave absolute protection to opinion work product. *See* Advisory Committee on Proposed Rules of Civil Procedure, *Report of Proposed Amendments to the Rules of Civil Procedure*, 5 F.R.D. 433, 456–460 (1946) (Rule 30(b)). The Court did not accept a Rules amendment codifying the work product doctrine until 1970, when it promulgated the current version of Rule 26(b)(3).

**64.** *Upjohn Co. v. United States, supra* note 49, 449 U.S. at 397–398, 101 S.Ct. at 686–687 (IRS summonses); *United States v. Nobles, supra* note 49, 422 U.S. at 238–240, 95 S.Ct. at 2170–2171 (discovery during a criminal trial). *See also* note 49 *supra.*

**65.** *Duffy* has been followed by every other circuit that has considered the question whether the work product doctrine creates a testimonial privilege before a grand jury. *See, e.g., In re Special September 1978 Grand Jury (II), supra* note 52; *In re Grand Jury Subpoena (John Doe, Inc.), supra* note 49; *In re Grand Jury Investigation (Sun Co.), supra* note 44; *In re September 1975 Grand Jury Term*, 532 F.2d 734 (10th Cir. 1976) (by implication). *See also In re Terkeltoub*, 256 F.Supp. 683 (S.D.N.Y.1966).

doctrine into the realm of privilege have each adopted its two-tiered structure—qualified protection for "fact" work product and more absolute protection for "opinion" work product.[66] They have also applied the basic concepts of exception and waiver to the new privilege.[67] This adaptation of the *Hickman* doctrine to the law of privileges is required, not by the inner logic of the work product doctrine alone, but primarily by a structural logic—courts should not frustrate the efforts of a grand jury unless the purpose as well as the letter of the privilege requires it.

◼ Applying the foregoing principles to the case before us, we find that a grand jury has issued a valid subpoena for 38 documents, and the District Court has held that eight portions of the documents must be disclosed.[68] We have carefully examined the entire record in this case, and we have no doubt that all 38 documents are precisely the sort of "memoranda, * * * mental impressions," and "thoughts, heretofore inviolate" for which the *Hickman* doctrine was fashioned.[69] Although Y＿＿＿ was Company's in-house counsel, his affidavit and the documents themselves establish that he was acting primarily in the role of an attorney advising clients in connection with SEC and IRS investigations, and that he

was acting at all times "with an eye toward litigation." Furthermore, we note that the documents were not meant for any eyes but their author's. Despite Y＿＿＿'s willingness to admit Company's ownership and surrender the documents, no one listening to the casette tape—Document No. 2—could imagine that Y＿＿＿ ever intended that it fall into the hands of his corporate superiors.

In short, the eight items on appeal are all opinion work product. Since the government has not yet attempted to make the extraordinary showing of necessity that would be required to remove the work product privilege under *Hickman* and *Upjohn Co. v. United States*, 449 U.S. 383, 101 S.Ct. 677, 66 L.Ed.2d 584 (1981),[70] the eight documents need not be produced unless the exception or implied waiver doctrines apply.

The status of the eight items under the attorney-client privilege is slightly more problematic. Most but not all reflect attorney-client communication. But Company has already disclosed the fact that these communications took place, as well as their substance, to both the SEC and the grand jury by releasing the extensive notes of a formal interview between Y＿＿＿ and the lawyers performing the voluntary investigation. The District Court therefore held

---

**66.** *See, e.g., United States v. Amerada Hess Corp.*, 619 F.2d 980, 987–988 (3d Cir. 1980); *In re Grand Jury Investigation (Sun Co.), supra* note 44, 599 F.2d at 1228–1231; *cf. Upjohn Co. v. United States, supra* note 49, 449 U.S. at 399–401, 101 S.Ct. at 687–688 (relying on Rule 26(b)(3)).

**67.** Every circuit which has considered the question has held or assumed that the crime-fraud exception applies to the work product privilege. *See, e.g., In re John Doe Corp.*, 675 F.2d 482, 492 (2d Cir. 1982); *In re Special September 1978 Grand Jury (II), supra* note 52, 640 F.2d at 62; *In re Berkley & Co.*, 629 F.2d 548, 553 (8th Cir. 1980); *In re Grand Jury Proceedings (FMC Corp.), supra* note 56, 604 F.2d at 802–803; *Duplan Corp. v. Deering Milliken, Inc., supra* note 57, 540 F.2d at 1219–1222; *In re September 1975 Grand Jury Term, supra* note 65, 532 F.2d at 737. Relatively fewer cases have applied the implied waiver concept in a situation clearly requiring recognition of a privilege, but at least two have held that the

work product privilege may be waived. *See United States v. Nobles, supra* note 49, 422 U.S. at 239, 95 S.Ct. at 2170; *Appeal of Hughes*, 633 F.2d 282, 288 (3d Cir. 1980); *cf. United States v. AT&T Co., supra* note 54, 642 F.2d at 1296–1301 (discussing waiver in a civil discovery context). *But cf.* 8 C. Wright & A. Miller, *supra* note 53, § 2024 at 209–210 (suggesting that waiver doctrine is inapplicable to work product). In *Permian Corp. v. United States*, 665 F.2d 1214, 1219 n.9 (D.C. Cir. 1981), we declined to reach a question of implied waiver of the work product privilege that arose from factual circumstances similar to those in this case.

**68.** *See* notes 33–36 *supra* and accompanying text.

**69.** *See Hickman v. Taylor, supra* note 51, 329 U.S. at 511, 67 S.Ct. at 393.

**70.** *See* note 60 *supra*.

that, even if the attorney-client privilege applied to these items, that privilege had been waived.[71]

 In the case before us we do not confront the applicability of the work product privilege to the files of nonlawyers or qualifications to the work product privilege. Without such difficulties we may assume that the attorney-client privilege applies. An exception or waiver of the work product privilege will also serve as an exception or waiver of the attorney-client privilege, since the coverage and purposes of the attorney-client privilege are completely subsumed into the work product privilege.[72]

Accordingly, we turn to the questions whether the doctrines of exception or implied waiver apply to the eight items of attorney work product before us.

## III

 According to *Clark*, no privilege applies "where the relation giving birth to it has been fraudulently begun or fraudulently continued."[73] Therefore, an attorney's opinion work product cannot be privileged if the work was performed in furtherance of a crime, fraud, or other type of misconduct fundamentally inconsistent with the basic premises of the adversary system.[74] In some circumstances the attorney may be innocently involved in the client's crime or fraud. But a guilty client may not use the innocence or ignorance of its attorney to claim the court's protection against a grand jury subpoena. Unless the blameless attorney is before the court with an independent claim of privilege, the client's use of an attorney's efforts in furtherance of crime or fraud negates the privilege.[75]

---

**71.** *In re Subpoena, supra* note 2, at 7–14 (July 16, 1980); *see* note 33 *supra.*

**72.** *See In re Grand Jury Proceedings (FMC Corp.), supra* note 56, 604 F.2d at 803. The work product privilege might not provide the same degree of protection as the attorney-client privilege to some types of documents. Thus, where the documents involved are entirely the work product of nonlawyers, or reflect purely factual matters, the work product privilege provides fairly limited protection, and the standard for implied waiver may not be as high as if the documents were protected by the attorney-client privilege as well. *See, e.g., United States v. Amerada Hess Corp., supra* note 66, 619 F.2d at 988. But where, as here, the documents involved all reflect the opinions, judgments, *etc.* of a lawyer, the work product privilege is for practical purposes as absolute as the attorney-client privilege, and it extends to a larger class of material. The District Court also treated the two privileges as functionally identical in this context, but it failed to analyze the waiver issue in terms of the broader policies of the work product privilege. *See* note 33 *supra. See also United States v. Tellier,* 255 F.2d 441 (2d Cir. 1958) (information that should have been communicated to a third party is not within the attorney-client privilege).

**73.** *Clark v. United States,* 289 U.S. 1, 14, 53 S.Ct. 465, 469, 77 L.Ed. 993 (1933).

**74.** *See Moody v. IRS,* 654 F.2d 795, 799–800 (D.C. Cir. 1981) (work product privilege may not apply to memorandum describing an improper meeting between an attorney and a judge); *In re Grand Jury Proceedings (FMC Corp.), supra* note 56, 604 F.2d at 802. In one

very recent case, *In re Doe,* 662 F.2d 1073 (4th Cir. 1981), *cert. denied,* —— U.S. ——, 102 S.Ct. 1632, 71 L.Ed.2d 867 (1982), the court apparently assumed that the government would have to show *both* crime or fraud *and* extraordinary necessity in order to withstand a motion to quash a grand jury's subpoena for an attorney's opinion work product. *See id.* at 1080–1081. This fallacy seems to have originated in a brief dictum in the *FMC Corp.* case: "We have no doubt that the crime-fraud exception comes within 'good cause' to deny applicability of the work product doctrine." 604 F.2d at 803. The exception for crime or fraud, however, stands apart from the basic qualification of the work product doctrine that a party may obtain work product on a showing of sufficient cause. When clients have used attorneys' efforts in furtherance of an ongoing crime or fraud, they are not entitled to protection from the courts. Once a sufficient showing of crime or fraud has been made, the privilege vanishes as to all material related to the ongoing violation.

**75.** Most of the cases assume that a client's ongoing crime or fraud suffices to remove work product protection. *See, e.g., In re Murphy,* 560 F.2d 326, 338 (8th Cir. 1977). But since the work product privilege belongs to the lawyer as well as the client, *see Moody v. IRS, supra* note 75; *In re Grand Jury Proceedings (FMC Corp.), supra* note 56, in some situations an attorney may be able to claim the privilege even though he or she was consulted in furtherance of the client's crime or fraud. *See FMC Corp., supra,* 604 F.2d at 801 n.4, 802 n.5. But there is no need to accord a guilty client standing to assert the claims of its innocent attorney. *See In re*

In the case at hand the record establishes a substantial possibility that Company's chairman and other senior officers conspired to bribe an official of one foreign government and possibly more, and that they conspired to make illegal corporate contributions to political campaigns in 1972.[76] More importantly, a comparison of X_____'s affidavit and those of Company officers indicates that Company officers may have conspired to defraud the government by submitting false information to the IRS in 1976 and to the SEC in 1978.[77] The chairman stated that the payment to X_____ was a "finder's fee" and that the officers who made political contributions at his behest had repaid Company's portion. The report given to the SEC casts doubt on those statements, but does not firmly state what the truth is.[78] It is possible, and even likely, that the chairman and other high Company officers have provided incomplete and misleading accounts of their involvement in these incidents to the government.

■ Despite this state of the record, the District Court rejected the government's ar-

gument that the exception for crime or fraud applied to this case. It gave no reasons for the rejection, however, beyond a one-sentence conclusion:

> In this case the government does not allege, and by all the evidence could not show, that the lawyers involved in the documents at issue were ever consulted for the purpose of furthering a crime or fraud.[79]

While the determination whether the government has made a sufficient showing to invoke the exception is committed to the sound discretion of the District Court in the first instance,[80] appellate courts do not hesitate to correct any error that clearly appears on the face of the record.[81] The record in this case and the phrasing of the District Court's holding establish that the District Court was wrong in rejecting the exception theory.

First, the government did allege that the lawyers were consulted for the purpose of furthering a crime or fraud; indeed, it was one of the government's principal arguments below.[82] Therefore, the District

---

*Special September 1978 Grand Jury (II), supra* note 52, 640 F.2d at 63.

In this case the attorney who prepared the critical documents, Y_____, has relinquished all his independent claims to preserving their confidentiality by turning them over to his former client's new lawyers. Although one of the parties now before the court is an attorney who could not have been involved in any crime or fraud by Company at the time these documents came into being, he is involved in the case only as the holder of the documents and representative of his client. Neither he nor his firm had anything to do with the work reflected in the documents before us. In our earlier opinion in this controversy, *In re Sealed Case, supra* note 34, we noted the difference between those who hold documents and share the interests of the party claiming privilege and those who do not share those interests. 655 F.2d at 1301. For all relevant purposes, then, the attorney now in possession of the documents has interests identical to those of his client and no independent stake in the confidentiality of the documents. Therefore, we need only consider those arguments available to Company, and this opinion does not discuss claims Y_____ could have raised had he not surrendered his files to Company after leaving its employ.

76. *See* notes 2–22 *supra* and accompanying text. The bribe that X_____ alleges was paid

to a foreign official in 1974 may not have been a violation of United States law at the time. The Foreign Corrupt Practices Act of 1977, 15 U.S.C. §§ 78dd–1 to –2 (Supp. IV 1980), eventually forbade bribes to officials of foreign governments by companies subject to the registration provisions of the Securities Exchange Act. The payment, if it occurred, was probably illegal under the law of the recipient's country.

77. *See* notes 2–22 *supra* and accompanying text; note 92 *infra* and accompanying text.

78. *See* text accompanying notes 21–22 *supra.*

79. *In re Subpoena, supra* note 2, at 6 (July 16, 1980).

80. *In re Berkley & Co., supra* note 67, 629 F.2d at 553; *In re September 1975 Grand Jury Term, supra* note 52.

81. *See, e.g., In re Special September 1978 Grand Jury (II), supra* note 52.

82. *See* Statement of Points and Authorities in Response to Motion to Quash Subpoena, at 9–13, *In re Subpoena, supra* note 2 (filed March 21, 1980). The allegations were supported by affidavits and portions of the transcripts of

Court must have found that the government's showing on this point was factually or legally insufficient.

■ When a grand jury's subpoena is at stake, the standard for evaluating an exception argument must be simple enough for courts to administer swiftly and efficiently, without obstructing the grand jury's mission or squandering judicial resources. The point is not to convict anyone of a crime or to anticipate the grand jury, but only to determine whether the possibility that a privileged relationship has been abused is sufficient to alter the balance of costs and benefits that supports the privilege. In making this determination courts will not be able to receive a complete adversary presentation of the issues, since one of the parties will not be privy to the information at issue. Any system that requires courts to make highly refined judgments—perhaps concerning volumes of documents—will most likely collapse under its own weight.[83] And it would run afoul of the basic prescription in *United States v. Dionisio*, 410 U.S. 1, 17, 93 S.Ct. 764, 773, 35 L.Ed.2d 67 (1973): "Any holding that would saddle a grand jury with minitrials and preliminary showings would assuredly impede its investigation and frustrate the public's interest in fair and expeditious administration of the criminal laws."

Accordingly, courts do not require proof beyond a reasonable doubt that someone has committed a crime or fraud. Rather, they undertake a simplified two-step inquiry. First, there must be a *prima facie* showing of a violation sufficiently serious to defeat the work product privilege.[84] Second, the court must find some valid rela-

various witnesses' testimony before the grand jury. *See id.* at Attachments A–F.

**83.** The problems of *in camera* inspection have been discussed in other contexts, most notably with respect to the Freedom of Information Act. *See generally Ray v. Turner*, 587 F.2d 1187, 1211–1215 (D.C. Cir. 1978) (Wright, J., concurring). This case highlights two significant problems caused by the lack of adversary presentation of issues raised by *in camera* documents. First, the District Court attempted a highly refined judgment—matching factual material in the 38 documents under subpoena against what had been disclosed in hundreds of pages of material already given to the grand jury and the SEC. The District Court's purported standard—that the work product privilege would be waived for all material as to which the attorney-client privilege had also been waived—required the court to comb the documents already provided for disclosures of attorney-client communications and then to isolate portions of the 38 documents relating to the same subject matter as the communications already revealed. Not only did this approach require the District Court to make complex judgments, but it would force a reviewing court to repeat the same difficult inquiry unless the District Court provided a detailed explanation for what it included and excluded from its production order. The District Court in this case provided only a general explanation of its decision with respect to one of the items that it ordered Company to produce—the casette tape—and gave no particularized reasons for any of its other decisions to require or not to require production. Second, the District Court's complex approach gave the government little opportunity to evaluate the court's opinion and plan its legal strategy. If the government had a better idea of what the documents that the District Court included and excluded were like, and how they related to the legal standard chosen, it might have decided to cross-appeal some of the District Court's judgments. Even in its present posture, the government is hampered by having no idea what type of information is contained in seven of the eight items that the District Court ordered Company to produce. Some may be irrelevant or unnecessary to the goals of the grand jury, but neither this court nor the District Court is in any position to make such a judgment well. This opinion attempts to frame legal standards that are capable both of relatively simple administration at the District Court level and of full explanation in opinions granting or denying motions to quash. Anything less would eventually restrict grand jury investigations unnecessarily, as well as trammel the rights of those claiming privileges.

**84.** At one point mere allegation of a crime or fraud was considered sufficient to defeat a claim of privilege. But with cases such as *O'Rourke v. Darbishire*, [1920] A.C. 581, 604 (H.L.), it was settled that "*prima facie* evidence that it has some foundation in fact" was required to invoke the exception. *See Clark v. United States, supra* note 73, 289 U.S. at 15, 53 S.Ct. at 469. Moreover, the violation involved must be of sufficient weight to warrant abridging the privilege. "No court should order disclosure * * * if the disclosure would traumatize the adversary process more than the underlying legal misbehavior." *Moody v. IRS, supra* note 74, 654 F.2d at 801.

tionship between the work product under subpoena and the *prima facie* violation.[85]

■■■■ The first condition may be met by a showing that the client was engaged in planning a criminal or fraudulent scheme when it sought the advice of counsel, or that the client actually committed or attempted a crime or fraud subsequent to receiving the benefit of counsel's work product.[86] The *prima facie* violation may also be the attorney's, since attorney misconduct negates the premise that the adversary system furthers the cause of justice.[87] The government's showing is sufficient if it proffers evidence that, if believed by a trier of fact, would establish the elements of some violation that was ongoing or about to be committed when the work product was prepared.[88] A specific showing of the client's intent in consulting the attorney or the attorney's intent in performing his or her duties is not required [89]—to require it would almost certainly lead to either the kind of "minitrial" forbidden by *Dionisio* or a near evisceration of the exception. In appropriate cases the subpoenaed material itself may provide *prima facie* evidence of a violation.[90]

Courts have disagreed on the degree of relatedness required to meet the second stage of the inquiry.[91] Once again, the special difficulties of extensive *in camera* inspection dictate that the standard not be too precise or rigorous. A finding that the work product reasonably relates to the subject matter of the possible violation should suffice.

■■■■ The record in this case has been described above, and it more than satisfies the *prima facie* violation requirement, especially as to the work Y——— did in connection with the IRS investigation. The possibility that Company's chairman lied to or attempted to mislead the IRS with his affidavit is enough to pass the first stage of the inquiry.[92] The portions of Documents 2 and

---

**85.** *See* cases cited in note 91 *infra.*

**86.** *See In re Grand Jury Proceedings (FMC Corp.), supra* note 56, 604 F.2d at 803; *In re Murphy, supra* note 75, 560 F.2d at 338.

**87.** *Moody v. IRS, supra* note 74; *cf. Appeal of Hughes, supra* note 67, 633 F.2d at 290 (opinion of Gibbons, J.) (misconduct by private investigator).

**88.** *See Appeal of Hughes, supra* note 67, 633 F.2d at 291 (opinion of Gibbons, J.); *cf. In re John Doe Corp., supra* note 67, 675 F.2d at 492 (using "probable cause" standard). Because of the need for speed and simplicity at the grand jury stage, courts should not employ a standard that requires them to hear testimony or to determine facts from conflicting evidence. The necessary amount of evidence should be roughly the same as that required to meet a burden of production, *see* C. McCormick, *supra* note 43, § 338 at 789. At trial, however, it may be more appropriate to treat the *prima facie* determination of crime or fraud as a preliminary fact to be found by the court after hearing sufficient evidence. *Compare Duplan Corp. v. Deering Milliken, Inc., supra* note 57, 540 F.2d at 1222.

**89.** *See, e.g., In re Grand Jury Proceedings (FMC Corp.), supra* note 56, 604 F.2d at 803; *In re Murphy, supra* note 75, 560 F.2d at 338–339. *See also* Callan & David, *Professional Responsibility and the Duty of Confidentiality: Disclosure of Client Misconduct in an Adversary System,* 29 Rutgers L.Rev. 332, 347–348 (1976).

**90.** *In re Special September 1978 Grand Jury (II), supra* note 52, 640 F.2d at 56–57; *In re September 1975 Grand Jury Term, supra* note 65, 532 F.2d at 737–738.

**91.** *Compare In re John Doe Corp., supra* note 67, 675 F.2d at 492 ("related"), *In re Grand Jury Proceedings (FMC Corp.), supra* note 56, 604 F.2d at 803 n.6 ("related"), *and in re September 1975 Grand Jury Term, supra* note 65, 532 F.2d at 738 ("potential relationship"), *with In re Murphy, supra* note 75, 560 F.2d at 338 ("close relationship"). The exact formulation of a "test" for relatedness is less important than an understanding of what the test must accomplish: easy differentiation between material for which the law should not furnish the protections of a privilege and material for which a privilege should be respected.

**92.** A conspiracy to submit false or misleading affidavits to a government agency in order to impede its lawful functions constitutes a violation of 18 U.S.C. § 371 (1976). *Dennis v. United States,* 384 U.S. 855, 86 S.Ct. 1840, 16 L.Ed.2d 973 (1966); *see United States v. Del Toro,* 513 F.2d 656, 664 (2d Cir. 1975), *cert. denied,* 423 U.S. 826, 96 S.Ct. 41, 46 L.Ed.2d 42 (1976). Conspiracies in violation of § 371 need not cause any monetary loss to the government, so long as they interfere with or obstruct its lawful functions. *Hammerschmidt v. United States,* 265 U.S. 182, 188, 44 S.Ct. 511, 512, 68 L.Ed. 968 (1924). In this case there is *prima facie* evidence that various officers of Company

3 that the District Court ordered Company to produce relate directly to the subject matter of this possible violation and others. In fact, these documents are primarily concerned with the state of knowledge of various Company officers about the X\_\_\_\_\_ payments and the illegal contributions. Given the substantial possibility that some of those officers, whose knowledge these documents reflect, may have lied to the IRS (and the grand jury) after receiving the benefit of Y\_\_\_\_\_'s advice, these two items must be produced before the grand jury.

■ Only one of the six items that come from the period of the SEC investigation clearly relates to a possible violation.[93] The District Court ordered Company to produce a single line of the notes on Document 29. While cryptic and difficult to read, this line apparently refers to a conversation involving Y\_\_\_\_\_, Company's president, and one of its treasurers, at which the three discussed what to do about X\_\_\_\_\_. The line is ambiguous. It might be innocent, but it might just as well reveal planning for still more payments to X\_\_\_\_\_, either to be passed through to foreign officials or to reward him for his silence. Or it might at least disclose an ongoing relationship between Company and X\_\_\_\_\_, thus casting doubt on the assertion of Company's investigators that they were unable to interview X\_\_\_\_\_ in order to learn the truth about the 1974 payments. In any event, the grand jury should be able to see this line and question witnesses about it.

None of the other five items come within the exception for crime, fraud, or serious misconduct. They were all created after the IRS affidavits, which provide the clearest *prima facie* evidence of a violation. Only one of the items, part of Document 35, mentions X\_\_\_\_\_, illegal contributions undisclosed in the IRS affidavits or SEC report, or anything else suspicious. That item is merely a list of subjects under investigation; it contains no information not already before the grand jury in many forms.

■ Therefore, the District Court was correct in its holding, if not its reasoning, with respect to the portions of Documents 2, 3, and 29 that it ordered Company to produce. There is a substantial likelihood that the work reflected in these items was performed in furtherance of a crime or fraud by Company or its officers, and therefore a court need not withhold them from a grand jury on the ground that they are protected by the work product or attorney-client privilege.

submitted false affidavits to the IRS in 1976 on the subject of the payment to X\_\_\_\_\_, and that the chairman submitted a highly misleading affidavit on the subject of the political contributions. Given the similarity of the language in the two affidavits submitted to this court with respect to the foreign payments issue, and given that the affidavits and other materials establish that many officers were involved in the domestic payments scheme, a reasonable person could infer the necessary agreement to mislead the IRS. And even if the misstatements did not disguise any tax obligation, they impaired the legitimate investigatory function of the IRS. Submission of false affidavits under these circumstances would also violate 18 U.S.C. § 1001 (1976). *See United States v. Ryan*, 455 F.2d 728, 733 (9th Cir. 1972).

Several other *prima facie* violations appear on the face of the record. Several Company employees seem to have told different stories to the grand jury from what they related privately at the time of the events. The documents at issue in this case provide evidence from which a reasonable person could infer that the chairman and other high officers at Company influenced them to alter their accounts of the facts, in violation of the prohibition in 18 U.S.C. § 1503 (1976) against influencing a grand jury witness corruptly or by threats. Furthermore, material in Documents 2 and 3, considered in light of what the persons Y\_\_\_\_\_ was advising ultimately stated to the IRS, might lead one to believe that Y\_\_\_\_\_ failed to advise his client in an independent manner as required by Canon 5 of Code of Professional Responsibility. *See Diversified Industries, Inc. v. Meredith*, 572 F.2d 596, 610 (8th Cir. 1977) (*en banc*); Block & Barton, *supra* note 13, at 44–45.

The evidence in the record before us would not be sufficient to convict Company's chairman or anyone else of any crimes, but that is not important at this stage. All that is required is that the likelihood of a violation be sufficient as a *prima facie* matter to warrant abridging any work product privilege that would normally attach to documents relating to the possible violation.

**93.** *See* note 36 *supra*.

## IV .

We next consider an alternative basis for upholding the grand jury's subpoena: implied waiver. The doctrine of implied waiver allows courts to retain some discretion to ensure that specific assertions of privilege are reasonably consistent with the purposes for which a privilege was created. The District Court found that Company had waived its work product privilege with respect to the eight items on appeal, essentially because it had already disclosed much of the information they contained, and the undisclosed information exposed "the enchanted nature of [the] tale" in the report provided to the SEC and the grand jury.[94]

While we differ with some of the District Court's reasoning and its application to several of the documents,[95] we believe the District Court was correct in its basic determination. Company entered into an arrangement with the SEC under which, as a matter of both common sense and common knowledge, Company relinquished its right to prevent the government from examining whatever documents were necessary for a fair evaluation of the final report offered to its shareholders and the SEC. Just because Company was successful in hiding crucial documents from the SEC, we need not allow Company to withhold them from a grand jury investigating possible crimes uncovered during the SEC's investigation. We do not consider whether we would imply a waiver in other types of litigation for all of Company's privileged files relating to the report. But the combination of factors in this case, including the fact that some of the documents impeach the veracity of Company's purported full disclosure, makes it inconsistent with the purposes of the work product privilege to deny the grand jury access to these documents.

### A.

The question with respect to implied waiver is whether Wigmore's "objective consideration" of fairness negates Company's assertion of privilege.[96] Existing case law offers little guidance as to what "objective considerations" make application of the work product privilege unfair. We have held that a party waives its work product protection in civil litigation if it discloses the privileged material to anyone without "common interests in developing legal theories and analyses of documents * * *."[97] On the other hand, if the party's prior disclosure, even to an adversary, resulted from judicial compulsion, courts will not imply a waiver.[98] And in *United States v. Nobles* the Supreme Court held that the work product privilege was waived when its holder made "testimonial use" of privileged material by adducing testimony as to some of the contents of a privileged document.[99]

---

**94.** *In re Subpoena, supra* note 2, at 10 (July 16, 1980).

**95.** The District Court's characterization, standing alone, would not suffice to create an implied waiver of the work product privilege. Inherent in recognition of a privilege for attorney work product is a judgment that society's interest in ferreting out the truth through litigation will not best be served by exposing a party's case to impeachment by documents reflecting the opinions or preliminary evaluations of its counsel, even if the party's position in court is inconsistent with counsel's private thoughts. Yet, in conjunction with our understanding of the context of this case, it makes a difference that documents that were never identified for or provided to the SEC—and that were in fact removed from the files that the SEC was likely to search when Y_____ resigned from his position with Company—happen to be documents that impeach Company's "official" position.

See also notes 52–57 *supra* and accompanying text.

**96.** *See* note 48 *supra* and accompanying text. ·

**97.** *United States v. AT&T Co., supra* note 54, 642 F.2d at 1300.

**98.** *See In re Grand Jury Investigation of Ocean Transportation, supra* note 48, 604 F.2d at 675; *Transamerica Computer Co. v. IBM Corp., supra* note 54, 573 F.2d at 651–652.

**99.** 422 U.S. 225, 239 & n.14, 95 S.Ct. 2160, 2171 & n.14, 45 L.Ed.2d 141. Note 14 states:

What constitutes a waiver with respect to work product materials depends, of course, upon the circumstances. Counsel necessarily makes use throughout trial of the notes, documents, and other internal materials prepared to present adequately his client's case,

The implied waiver doctrine has been more fully developed, however, in the context of the attorney-client privilege. Any disclosure inconsistent with maintaining the confidential nature of the attorney-client relationship waives the privilege.[100] When a party reveals part of a privileged communication in order to gain an advantage in litigation, it waives the privilege as to all other communications relating to the same subject matter because "the privilege of secret consultation is intended only as an incidental means of defense and not as an independent means of attack, and to use it in the latter character is to abandon it in the former." [101]

A simple principle unites the various applications of the implied waiver doctrine. Courts need not allow a claim of privilege when the party claiming the privilege seeks to use it in a way that is not consistent with the purpose of the privilege.[102] Thus, since the purpose of the attorney-client privilege is to protect the confidentiality of attorney-client communications in order to foster candor within the attorney-client relationship, voluntary breach of confidence or selective disclosure for tactical purposes waives the privilege. Disclosure is inconsistent with confidentiality, and courts need not permit hide-and-seek manipulation of confidences in order to foster candor.

The purposes of the work product privilege are more complex, and they are not inconsistent with selective disclosure—even in some circumstances to an adversary.

Yet at some point acceptable tactics may degenerate into "sharp practices" inimical to a healthy adversary system. When that occurs—when a party seeks greater advantage from its control over work product than the law must provide to maintain a healthy adversary system—then the balance of interests recognized in *Hickman* and *Duffy* shifts, and the courts need not impede a grand jury's legitimate efforts in the name of protecting the adversary system.

## B.

The circumstances of this case convince us that respecting Company's claim to work product privilege is not required to maintain a healthy adversary system. We evaluate in turn three general factors that justify an implied waiver as to some of the documents in this case: the basic conditions of the SEC's voluntary disclosure program, the express assurances Company offered regarding the completeness of the final report given to the SEC and the grand jury, and the importance of specific documents for a fair evaluation of Company's voluntary disclosure.

### 1. Ground rules of the SEC's voluntary disclosure program.

Realistic appraisal of the circumstances surrounding Company's claim of privilege requires some understanding of the basic features of the SEC's voluntary disclosure program. As the many cases concerning companies that participated in the program attest,[103] the program involved a unique use

and often relies on them in examining witnesses. When so used, there normally is no waiver. But where, as here, counsel attempts to make a testimonial use of these materials the normal rules of evidence come into play with respect to cross-examination and production of documents.

**100.** *United States v. AT&T Co., supra* note 54, 642 F.2d at 1299.

**101.** 8 J. Wigmore, *supra* note 48, § 2327 at 638.

**102.** *Cf. id.* § 2340 at 671–672 (waiver of privilege for marital communications); *id.* § 2379 at 812–813 & n.10 (waiver of privilege for official secrets). Note that, while privileges that seek to foster confidential relationships may be

waived by voluntary disclosure, the privilege for military secrets, which protects specific types of information as well as relationships, is not necessarily waived by disclosure. *See Firth Sterling Steel Co. v. Bethlehem Steel Co.,* 199 F. 353 (E.D. Pa. 1912). *See also United States v. Bryan, supra* note 41, 339 U.S. at 332–333, 70 S.Ct. at 731 (challenge to the adequacy of a congressional subpoena must be made in good faith or it is waived).

**103.** *See, e.g., Permian Corp. v. United States, supra* note 67; *Diversified Industries, Inc. v. Meredith, supra* note 92; *In re Grand Jury Investigation (Sun Co.), supra* note 44; *In re Grand Jury Subpoena (John Doe, Inc.), supra* note 49.

of private lawyers and the adversary system to accommodate the joint needs of government and the private sector. Participating corporations used their own lawyers and resources to perform independent investigations of their business practices, and they turned over the full results of the investigations to the SEC.[104] The program was valuable to corporations because their boards of directors often had inadequate knowledge of the corporations' actual business practices,[105] and because the SEC offered leniency, with a chance to avoid an intrusive and embarrassing formal investigation, to corporations that made full disclosure and ended any objectionable practices uncovered during the investigation.[106] The program was valuable to the SEC because it brought hundreds of corporations into compliance with the law without a massive commitment of government resources to investigations and litigation.[107]

It would have been completely unreasonable, however, for the SEC to accept corporations' voluntary disclosures at face value. The gravity of the problem and the likelihood that—left to their own devices—corporations would prefer not to investigate their own misdeeds with vigor demanded that the SEC establish a mechanism to ensure that corporations' voluntary disclosures were truly full disclosures. The best check on corporate good faith would be to retrace the steps of the independent investigations, but that would have strained the SEC's available staff. Nevertheless, by making certain that its staff *could* have access to the background material in corporations' files, the SEC could ensure a high level of accuracy in the reports it received.[108] Even if the staff did not examine every document, it could make spot checks to catch corporations that attempted to shade the truth.

Thus SEC access to corporate records concerning the matters under investigation was a logical, even necessary, feature of the voluntary disclosure program. No corporation could have reasonably expected to submit a report to the SEC and receive lenient treatment in return unless the SEC could check the accuracy of the report. It taxes credulity to suggest otherwise. And the SEC did not leave corporations to speculate as to whether it would demand to see corporate files. Responsible SEC officials stressed this aspect of the program at every opportunity, and it was widely discussed by the bar.[109]

The SEC's demand for access to underlying documentation had obvious implications for the attorney-client and work product privileges. Every document relating to a voluntary investigation was potentially privileged. It had generally passed from a corporation to the investigating attorneys,

**104.** *See* text accompanying note 15 *supra.* Ultimately, the information discovered in these investigations was to be turned over to the stockholders of the participating companies and to the investing public. In most instances, however, the SEC allowed companies to withhold from the public details such as the names of foreign nations and the identities of those who received bribes. *See* Herlihy & Levine, *supra* note 3, at 581–582.

**105.** The early stages of the SEC's payments investigation revealed that corporations' boards of directors seldom knew much about their companies' day-to-day business practices. One of the benefits of the voluntary disclosure program was calling the attention of those ultimately responsible for a corporation's actions to the corporation's corrupt or questionable payments. *See* Block & Barton, *supra* note 13, at 7; Coffee, *supra* note 13, at 1127–1132. In the end, of course, a corporation's shareholders also have a right to know about its business practices and the quality of its management. *See* text accompanying note 122 *infra.*

**106.** *See* Block & Barton, *supra* note 13, at 7–8. The SEC did not expressly guarantee lenient treatment, however, and it made clear its determination to seek appropriate relief in egregious cases. *See Senate Hearing, supra* note 14, at 27–28 (colloquy among Chairman Hills, Stanley Sporkin, and Senator Proxmire). *See also JEC Hearings, supra* note 10, at 9–11.

**107.** *See* note 10 *supra* and accompanying text.

**108.** *See JEC Hearings, supra* note 10, at 23 (statement of S. Sporkin); Henderson & Sommer, *supra* note 13, at 429 (statement of S. Sporkin).

**109.** *See* sources cited at note 15 *supra*; Dunn, *supra* note 3, at 1317–1334.

or it had been collected and arranged by the attorneys, or it had been drafted by the attorneys or their agents in the course of the investigation. Accordingly, as soon as the program began questions arose as to the status of privileged documents. In the early consent decrees that shaped the program the SEC made certain to preserve its access to privileged material,[110] and lawyers soon learned that in every case the SEC would demand access to privileged material.[111]

Many companies were able to reach agreements with the SEC, either informally or through formal consent decrees, to prevent the SEC from disclosing privileged documents to third parties.[112] But the SEC did not compromise on its own access to privileged documents.

There is no information in the record as to whether Company ever reached an explicit agreement with the SEC, but it is clear that the SEC availed itself of access to documents, such as the investigators' notes of their interviews, that would have been within the work product privilege under other circumstances. Furthermore, the SEC searched through Company's files, at least thoroughly enough to uncover evidence of abuses that had been omitted from the report.[113] By that time or soon after, however, Y_____ had removed the 38 documents in this case from Company's files, and it is undisputed that the SEC never examined them.[114] Nevertheless, we presume that in this case the SEC did not take the unprecedented and unwarranted step of

110. The earliest consent decrees required the SEC to obtain a protective order from the court forbidding it to release documents to third parties before it could take access to privileged documents. *See, e.g.,* Consent and Undertaking of Lockheed Aircraft Corp. ¶ 26, *SEC v. Lockheed Aircraft Corp.,* [1975–1976 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 95,509, at 99,-578 (D.D.C.1975); Undertaking of Ashland Oil, Inc., *SEC v. Ashland Oil, Inc.,* D.D.C.No.75-0794 (May 16, 1975). Later decrees incorporated a prohibition against disclosure to third parties into the consent itself. *See, e.g.,* Undertaking of J. Ray McDermott & Co. at 4–5, *SEC v. J. Ray McDermott & Co.,* D.D.C.No.76–1854 (Oct. 6, 1976); Final Judgment of Permanent Injunction at 5, *SEC v. General Telephone & Electronics Corp.,* D.D.C.No.77–0157 (Jan. 27, 1977). Significantly, when the SEC returned to the District Court in the *Lockheed* case, in order to take access to Lockheed's privileged documents, the court's protective order expressly exempted disclosure to "a duly authorized grand jury" from its general prohibition against disclosures to third parties. *SEC v. Lockheed Aircraft Corp.,* 404 F.Supp. 651, 653 (D.D.C.1975).

111. In a 1977 securities law symposium sponsored by the Practising Law Institute, Arthur Mathews, a partner in the Washington, D.C. law firm of Wilmer, Cutler & Pickering, stated: "If the SEC is in the case, the staff is going to try, in any settlement, to get the corporation to waive the attorney-client and work-product privileges. The staff has done that in every case that I have ever tried to negotiate." Mathews, *The Functioning of Directors in "Sensitive Payments Inquiries", in* Ninth Annual Institute on Securities Regulation 83, 90 (PLI 1978) (footnote omitted). One year earlier, in the same forum, SEC Enforcement Division Di-

rector Stanley Sporkin had stated that he did not think privilege applicable to the voluntary disclosure context. Henderson & Sommer, *supra* note 13, at 430. *See also* Dunn, *supra* note 3, at 1317–1318 (IRS normally requests work product materials in questionable payments tax investigations).

112. *See* Coffee, *supra* note 13, at 1265 & n.584; note 110 *supra. See also* SEC Rel. No. 5571 (Feb. 21, 1975) (SEC Freedom of Information Act policy). Corporations mainly sought to prevent the SEC from releasing their documents under the Freedom of Information Act. At the time the SEC had a liberal FOIA disclosure policy, and the Supreme Court had not yet ruled on the right of corporations to object to agency disclosures of corporate documents, *see Chrysler Corp. v. Brown,* 441 U.S. 281, 99 S.Ct. 1705, 60 L.Ed.2d 208 (1979), or the applicability of the FOIA to documents for which an agency had a right to access but did not actually possess, *see Forsham v. Harris,* 445 U.S. 169, 100 S.Ct. 978, 63 L.Ed.2d 293 (1980).

113. *See* note 24 *supra* and accompanying text.

114. Company's reply brief states, "[T]he materials at issue *have never been disclosed to anyone* other than [Company's] own counsel." Reply brief for appellants at 6 (emphasis in original). Furthermore, although all files relating to the voluntary investigations were supposedly kept in one place and released to the Company employees who needed them only on a "check out" basis, *see* Final Report, *supra* note 17, at 3, Y_____ took the documents at issue in this case with him when he left Company in August 1978, just as the SEC's evaluation of Company's voluntary disclosures was beginning.

relinquishing its right of access to materials necessary for a fair evaluation of the report.

### 2. *Express representations concerning Y_____'s files.*

When the lawyers retained by Company to perform its voluntary investigation interviewed Company's officers and employees, they followed a standard interview format. That format had been developed in advance, and it was reprinted as Exhibit 1 to the investigative counsel's final report. Question 10 on the standard format asked:

> Have all your files relating to matters which have been discussed or which are the subject matter of this investigation been made available to us through the Company's General Counsel? [115]

The investigators' notes confirm that they asked this question of all but one or two of the 52 persons interviewed during the investigation. Y_____ himself was among those who had formal interviews with the investigators. At his interview on July 6, 1977 Y_____ was asked and responded to Question 10. Two of the lawyers present took notes, and both recorded Y_____'s response: "Yes—made work files available at this time" [116]; "Yes (including personal files)." [117] Thus Y_____ assured the lawyers that he had given them all his files relating to the subject matter of the investigation, or at least those files in existence on July 6, 1977.

The investigative counsel's final report made much of the cooperation of the interviewees with respect to their files. "[W]e were advised by all persons interviewed that all their files relating to matters which were discussed or which might be relevant to the subject matter of this investigation had been made available to us." [118] Furthermore, the report stated that its findings were based on a thorough review of those files, made without budget or time constraints. [119]

Company provided both the report and the investigators' notes containing Y_____'s assurances to the SEC and the grand jury. Under the basic conditions of the voluntary disclosure program, anyone reading the report could thus expect it to reflect any relevant material in files that Y_____ should have provided to the investigators. And they could also expect that the report could be checked against the files themselves.

### 3. *Importance of Y_____'s files for a fair evaluation.*

It appears, then, that there was a category of documents that the final report of Company's investigative counsel should have reflected, and that clearly came within the scope of Y_____'s express assurances, that could not be withheld from the SEC on a claim of privilege. Technically, all of Y_____'s files relating to the subject matter of the investigation come within that category. But for purposes of the fairness element of the implied waiver doctrine there are relevant differences among the eight items on appeal in this case.

Some of the items on appeal are notes of Y_____'s conversations with the investigators regarding their interviews with third parties. The information in these notes is fully reflected in the investigators' extensive notes of the interviews themselves. [120] Other items merely list or summarize subjects under investigation, without any particular system or extraordinary completeness. The limited information in these items adds nothing to the report or notes, and no one would consider them necessary to a fair evaluation of the report. [121] Furthermore, only two of the items—Docu-

---

115. Final Report, *supra* note 17, Exhibit 1 at 1 2.

116. Interview Notes, *supra* note 31, at F00933.

117. *Id.* at F00953.

118. Final Report, *supra* note 17, at 4.

119. *Id.* at 8; *see id.* at 3.

120. Documents 14 and 16. *See* note 36 *supra.*

121. Documents 35, 38, and the portion of Document 21 marked by the District Court. *See* note 36 *supra.*

ments 2 and 3—were in existence on July 6, 1977 when Y———— expressly stated that he was turning over his files to the investigators.

But those two documents bear directly on the core subject matter of the investigation, and they contain information in such quantity and detail that the investigative record could not be complete without them. Moreover, the report and notes do not fully reflect what the documents reveal about the attitude of Company's highest officers toward investigating the truth about Company's business practices. Nothing could be more relevant to the main purpose of the voluntary investigation—providing Company's board and stockholders with information about management's policies and practices regarding bribery and corruption.[122] These documents, especially the tape, impeach the "official version" provided in the final report by placing in doubt not only the stories told by Company's officers, but also their willingness to tell the truth. Therefore Documents 2 and 3 were necessary for any fair evaluation of the report.[123]

### C.

Company has promulgated a carefully worded story in the form of a full disclosure, and its apparent consent to letting the SEC staff evaluate its disclosure, by examining the relevant underlying material, has lent credence to its representation of full candor. Yet at the same time it has withheld crucial documents that reveal a different, highly embarrassing, version of events. If we were to allow corporations to use the work product privilege to accomplish such a sleight-of-hand, it would severely limit the effectiveness of voluntary disclosure programs.

■ The purposes of the work product privilege do not require us to acquiesce in Company's manipulation. When a corporation elects to participate in a voluntary disclosure program like the SEC's, it necessarily decides that the benefits of participation outweigh the benefits of confidentiality for all files necessary to a full evaluation of its disclosures.[124] It forgoes some of the

---

**122.** *See* Report, *supra* note 11, at 31; Herlihy & Levine, *supra* note 3, at 575; Note, *supra* note 13, 89 Harv.L.Rev. at 1855–1856.

**123.** The portion of Document 29 that the District Court ordered Company to produce poses a special problem. It reflects a conversation between Y———— and other Company officers that occurred during the later stages of the voluntary investigation, months after Y————'s express representation that he had provided all of his files to the investigative counsel. The lawyers performing the investigation would not have known of the substance of the conversation unless one of the participants called it to their attention. The brief phrase in Document 29 referring to this conversation is ambiguous at best. *See* text accompanying note 93 *supra*. If the conversation related to ongoing misconduct at Company, Y———— should have informed the investigative counsel about the conversation and provided his memorandum of it, since ongoing misconduct was clearly within the scope of the disclosures required under the SEC's program. *See Senate Hearing, supra* note 14, at 26. On the other hand, if the conversation was innocent there was no reason to disclose it, either to the investigators or to the SEC. On balance, this item lacks too many of the objective factors that contribute to our decision to imply a waiver as to Documents 2 and 3, and therefore we hold that Company has not

waived its work product privilege as to the marked portion of Document 29.

**124.** *See* Note, *supra* note 13, 32 Stan.L.Rev. at 1176–1181. The situation in this case is analogous to that in *United States v. Cote*, 456 F.2d 142, 144–145 (8th Cir. 1972), in which the court held that when a taxpayer files an amended return it waives its attorney-client privilege for workpapers that would otherwise come within the privilege, because submission of an amended return necessarily implies consent for the IRS to examine the details underlying the information, and in *In re John Doe Corp., supra* note 67, 675 F.2d at 488–489 in which the court held that a corporation could not claim attorney-client privilege for documents disclosed to its Underwriter Counsel. *Cf. Couch v. United States, supra* note 42, 409 U.S. at 335, 93 S.Ct. at 619 (refusing to recognize an accountant-client privilege in the context of a criminal investigation relating to tax returns, because the entire tax system "largely depends on honest self-reporting"); *United States v. Tellier, supra* note 72, 255 F.2d at 447–448 (information that the attorney thought his client would communicate to the SEC is not within the attorney-client privilege). It is also analogous to the "testimonial use" that the Supreme Court in *Nobles* held to imply a waiver. *See* note 99 *supra* and accompanying text. In *Nobles* the defendant waived his privilege as to an investi-

traditional protections of the adversary system in order to avoid some of the traditional burdens that accompany adversary resolution of disputes, especially disputes with such formidable adversaries as the SEC.[125] That is not to say that the work product privilege is irrelevant in the voluntary disclosure context. Corporations may protect their privileges without manipulation simply by being forthright with their regulators and identifying material as to which they claim privilege at the time they submit their voluntary disclosure reports. They will, of course, bear the risk that their reports will not be accepted as full disclosures. But if they choose to make a pretense of unconditional disclosure, they bear another risk—that we will imply a waiver of privilege with respect to any material necessary for a fair evaluation of their disclosures.

Company argues that, even if it impliedly waived its work product privilege vis-á-vis the SEC, the doctrine of "limited waiver" advanced in *Diversified Industries, Inc. v. Meredith*, 572 F.2d 596, 611 (8th Cir. 1977) (*en banc*), prevents us from extending that waiver to the grand jury. In *Diversified* a civil litigant attempted to obtain discovery

of a voluntary disclosure program final report and an underlying memorandum. *Id.* at 599. Diversified Industries had waived its attorney-client privilege by giving the documents to the SEC, but the Eighth Circuit held that disclosure to the SEC did not constitute a waiver as to anyone but the SEC. It reasoned:

> To hold otherwise may have the effect of thwarting the developing procedure of corporations to employ independent outside counsel to investigate and advise them in order to protect stockholders, potential stockholders and customers.

*Id.* at 611.

We do not apply the *Diversified* limited waiver doctrine to this case. As an initial matter, we note that this circuit rejected the limited waiver theory as an unnecessary expansion of the attorney-client privilege in *Permian Corp. v. United States*, 665 F.2d 1215, 1220–1222 (D.C. Cir. 1981). Furthermore, a grand jury's claim to disclosure is stronger than that of a civil litigant.[126]

We nevertheless share the *Diversified* court's basic concerns—promoting effective voluntary disclosure programs and respecting legitimate claims of privilege.

---

gator's notes when the investigator referred to them while testifying for the defense. In the instant case the investigative counsel's final report refers to files that were furnished to the lawyers preparing the report, and it purports to reflect the relevant material in those files. *See* notes 115-119 *supra* and accompanying text. Just as in a criminal trial the government and the jury have a right to evaluate a witness' account of his notes he had taken shortly after a crime by evaluating those notes, the SEC and the grand jury have a right to evaluate Company's report by examining the documents it purports to reflect.

**125.** *See* Noonan, *The Purposes of Advocacy and the Limits of Confidentiality*, 64 Calif.L. Rev. 1485, 1489 (1966):

> Thus, it appears that neither confidentiality nor the adversary system is an absolute; each is justified pragmatically by its ability to serve certain social needs. Professor Freedman repeatedly treats a privileged communication as an absolute which takes precedence over all other values. He justifies this by asserting that complete lawyer-client confidentiality is necessary to the adversary system. Yet such confidentiality is necessary to

the adversary system only if the system exists as Professor Freedman views it. Asserted as a standard by which to measure the lawyer's conduct in all situations, absolute confidentiality is inimical to a system which has as its end rational decision-making.

**126.** The Fourth Circuit has rejected the *Diversified* limited waiver theory in a grand jury context, for this reason. *In re Weiss, supra* note 38, 596 F.2d at 1186. *Cf. In re John Doe Corp., supra* note 67, 675 F.2d at 489 (following *Permian*). Recognition of the special strength of a grand jury's claim to documents underlying a voluntary investigation is also implicit in the judgment entered in the *Lockheed* case, *see* note 110 *supra*, which forbade the SEC to disclose the documents it examined to anyone other than a grand jury. *See* 404 F.Supp. at 653. *See also In re Grand Jury Subpoena (General Dynamics Corp.)*, [1980] Fed.Sec.L. Rep. (CCH) ¶ 97,562 (D.Conn.1980). Furthermore, the SEC is not entitled to more solicitude than a grand jury. *Cf. Permian Corp. v. United States, supra* note 67, 665 F.2d at 1221–1222 (the SEC is not entitled to more cooperation from the courts than other agencies).

But we differ in our assessment of which rule will best advance those goals. The grand jury has the same interests as the SEC in this case. The SEC has no jurisdiction to prosecute criminal violations, so it turns its cases over to the Justice Department whenever its investigations reveal possible criminal offenses. At that point further investigation is the province of Justice Department prosecutors and grand juries. If, applying the limited waiver doctrine, we held that a grand jury could not avail itself of the SEC's right to examine underlying documents, the SEC would be forced to seek out and take possession of all documents relating to criminal violations before turning cases over to grand juries.[127] Furthermore, such a holding would encourage corporations to do what Company has done in this case—either hide documents from the SEC or hope that the SEC staff does not stumble upon them, and then claim privilege against other arms of government as soon as the SEC inquiry has ended.

In the final analysis, *Diversified* goes much farther than necessary to accomplish its objective. The SEC or any other government agency could expressly agree to any limits on disclosure to other agencies consistent with their responsibilities under law. But courts should not imply such agreements on a categorical basis.[128] We prefer to leave to the SEC the question of what guarantees of confidentiality it will offer to corporations undertaking voluntary disclosures. And we are certain that its judgment about what will "thwart" and what will advance the goals of its voluntary disclosure program will be better than ours. Our duty in this context is to protect the vitality of the adversary system, and that purpose does not require limiting Company's waiver to the SEC.

### D.

In conclusion, we imply a waiver of work product and attorney-client privileges with respect to Documents 2 and 3. When Company submitted its investigative counsel's report and notes to the SEC and otherwise complied with the ground rules of the voluntary disclosure program, it bound itself to provide the SEC access to any documentation necessary to evaluate the report. Any claim of privilege should have been made with particularity at that time. Documents 2 and 3 come within a category of documents clearly identified in the report and notes as material to the investigation, and our own review reveals that they are necessary for a fair evaluation of the representations in the report. If we allowed Company to withhold them under a claim of privilege, we would encourage further games of cat-and-mouse between corporations and their regulators. Protecting the adversary system does not require that result. It would strain equity and sound policy to allow corporations to withhold records that are properly characterized as underlying documents of their reports to the SEC. Corporations and their lawyers surely enter voluntary disclosure programs with the understanding that privilege will not force the government to take them at their word.

The lawyer's work product privilege was conceived by lawyers who succeeded in having lawyers-become-judges accept the idea. The basis for that acceptance was that, while honesty, full disclosure, and fair dealing are indispensable to justice, our judicial system—an adversary system, in most instances—should function more effectively where the work product of the lawyer is

---

**127.** The SEC may not pursue an investigation solely to gather evidence for a criminal prosecution. *See Donaldson v. United States*, 400 U.S. 517, 536, 91 S.Ct. 534, 545, 27 L.Ed.2d 580 (1971). However, "[f]or a fraud investigation to be solely criminal in nature would require an extraordinary departure from the normally inseparable goals of examining whether the basis exists for criminal charges and for the assessment of civil penalties." *United States v. LaSalle Nat'l Bank*, 437 U.S. 298, 314, 98 S.Ct. 2357, 2366, 57 L.Ed.2d 221 (1978). Therefore, the SEC might well be tempted to violate the spirit of *Donaldson* without running afoul of *LaSalle's* "extraordinary departure" standard.

**128.** *Cf. In re Penn Central Commercial Paper Litigation*, 61 F.R.D. 453, 464 (S.D.N.Y.1973) (rejecting the theory that testimony in an informal, nonpublic investigation did not waive attorney-client privilege with respect to subsequent litigation).

protected from unnecessary disclosure. But here the agreement to cooperate with the SEC in determining the facts was intended to alter the adversary relationship. Together the parties were to seek the truth. Certainly, in such circumstances where lawyer and client attempt to manipulate the work product privilege as Company and its counsel have done in this case, the cause of justice compels disclosure, and a waiver is implied.

## V

Some 55 years ago Judge Learned Hand aptly stated what we regard as the fundamental issue in this case:

> The question is no less than whether courts must put up with shifts and subterfuges in the place of truth and are powerless to put an end to trifling. They would prove ·themselves incapable of dealing with actualities if it were so, for there is no surer sign of a feeble and fumbling law than timidity in penetrating the form to the substance. * * * [129]

The vitality of the adversary system is of great concern to us, as it is to all courts, and we have due regard for the importance of privilege in maintaining that vitality. It would ill serve the adversary system, however, if we were to exalt the form of privilege over its substance. Through the doctrines of implied waiver and exception, the law entrusts the courts with a duty to guard that the offices of lawyers, and the respect which we have for the bar, are not used for unfair or corrupt purposes.

In the exercise of that duty, we have determined that there is a substantial likelihood that the multinational corporation before us has attempted to manipulate its privilege, by withholding vital documents while making a great pretense of full disclosure of their contents. It does not deserve the protections enjoyed by those who use the adversary system for its legitimate ends. Therefore, we have held that the District Court did not err in ordering Company's attorney to disclose two portions of its former general counsel's files, because

Company has waived its privilege as to those portions of Documents 2 and 3 that the District Court directed Company's attorney to produce before the grand jury. Because the District Court held Company's attorney in contempt for refusing to produce documents that remain privileged as well as documents as to which there is no privilege, we vacate the District Court's order of June 20, 1981, and remand for expeditious proceedings not inconsistent with this opinion.

*So ordered.*

WALD, Circuit Judge, concurring:

I concur in Parts I, II, IV and V of Judge Wright's opinion as they relate to documents 2 and 3. Within the context of the SEC's voluntary disclosure program, it would be inequitable to allow a corporation to foster the appearance of full disclosure, and later withhold records that are properly characterized as underlying documents of its report to the SEC. Documents 2 and 3 clearly fall within this category of underlying documents. Under the ground rules set up by appellant ("Company"), outside counsel was authorized to interview in-house counsel. In this interview, in-house counsel recounted discussions with top Company officials that are described in documents 2 and 3, and expressly agreed (in accordance with standard procedures) to hand over files relating to these discussions. Having relied on the appearance that all relevant documents were available to both outside counsel and SEC investigators, Company cannot now hide behind a cloak of privilege.

---

**129.** *Loubriel v. United States,* 9 F.2d 807, 808 (2d Cir. 1926).