Kennon H. HAGER, M.D., Plaintiff,

v.

BLUEFIELD REGIONAL MEDICAL CENTER, INC., et al., Defendants.

No. 96–93.

United States District Court, District of Columbia.

Jan. 15, 1997.

David L. Kelleher, Arent Fox Kintner Plotkin & Kahn, Washington, DC, for Plaintiff.

Stephen D. Graeff, Carr, Morris & Graeff, P.C., Washington, DC, Bruce W. Hilyer, P.S., Seattle, WA, J. Michael Ranson, George G. Guthrie, Robert B. King, King, Allen & Guthrie, Charleston, WV, Peter H. Gunst, Weiner, Astrochan, Gunst, Hillman & Allen, P.C., Baltimore, MD, Robert J. O'Neil, Spilman, Thomas & Battle, Charleston, WV, for Defendants.

## MEMORANDUM ORDER

URBINA, District Judge.

### Granting Defendants' Motion to Compel Production of Documents

#### I. Introduction

This matter comes before the court upon the defendants' motion to compel production of certain memoranda that were prepared by plaintiff's former counsel, Arent Fox Kitner Plotkin & Kahn (Arent Fox). There are two issues before the court. Specifically, the court must determine whether the memoranda at issue in this case are protected from disclosure by the work·product privilege. If they are, the court must then decide whether the plaintiff has waived the privilege thereby making the memoranda discoverable.

After considering the parties' submissions and the relevant law, the court concludes that the memoranda constitute work product because they were prepared in anticipation of possible litigation. Dr. Hager, however, waived the privilege as it applies to the memoranda by placing his former attorneys' opinions directly at issue in a case that is currently pending in federal court in West Virginia.

#### II. Background

The Plaintiff, Dr. Kennon H. Hager, is suing Bluefield Regional Medical Center, Inc. (BRMC) and five co-defendants in the Southern District of West Virginia for *inter alia,* breach of contract and violation of the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1961.[1]

---

1. The five other named defendants in that action are:

 1. Community Care, Inc. (CC), is a corporation organized and conducting business under the laws of West Virginia. Its principal place of business is in Bluefield, West Virginia. It is affiliated with BRMC and BHS, Inc. CC was the entity designated by the defendants to provide billing services for Dr. Hager.

 2. Bluefield Health Systems, Inc. (BHS), is a corporation organized and operating under

From August 1, 1992 to October 1992, Dr. Hager, a Board-certified radiologist, served as the medical director of the radiology department at BRMC. He provided BRMC radiological services under an exclusive contract. BRMC is a non-profit corporation organized under the laws of West Virginia, with its principal place of business in Bluefield, West Virginia. BRMC provides a variety of medical services.

In mid 1992, BRMC recruited Dr. Hager to relocate to Bluefield to serve as the medical director of the BRMC radiology department under an exclusive, sole-provider arrangement. During the course of the initial negotiations with the hospital, Dr. Hager stated that he wished to provide BRMC radiological services as an independent contractor (as opposed to as an employee of BRMC) whose compensation would be based on the fees he collected.

On July 17, 1992, BRMC provided Dr. Hager with a letter outlining the terms of an agreement "intended to form the basis for the development of an exclusive contract ... [to] be formalized" at a later date (BRMC letter). The initial term of the contract was for two years with a possibility for a two year extension. Paragraph 12 of the BRMC letter proposes that either the hospital or its affiliate would provide billing and other administrative services to Dr. Hager. Paragraph 12 states:

> Recognizing the difficulty in starting a practice and the need to concentrate on patient care and recruiting, administrative services to include billing, collection, marketing and legal advice will be provided to your group by either BRMC or Bluefield Health Systems at a fee approximating the cost of these services which is established at 20% of net collections. This fee will be subject to annual renegotiations based upon cost and volume of services provided.

Paragraph 15 of the letter provides for a "windfall provision" which reads:

In the event that your radiology group acquires an amount of revenue, which may be considered "windfall" profits from the practice of radiology at the BRMC, and the radiology group has an appearance of violation of the *Safe Harbor* compliance concerning wind-fall profits, BRMC, in compliance with *Safe Harbor* regulations may obtain remuneration from your group in an amount not to exceed the equivalent of the "windfall" profit.

During subsequent negotiations, Dr. Hager alleges that he expressed his concern (to BRMC representatives) regarding the legality of these two paragraphs. Except for paragraphs 12 and 15 the parties agreed upon all of the other terms of the BRMC letter. On July 21, 1992, at Dr. Hager's insistence, BRMC rewrote the letter to add the following clause to the final sentence of paragraph 12: "[A]nd [the fee] will be in compliance with all state, federal and other recognized laws and regulations." With respect to paragraph 15, Dr. Hager states that the hospital represented to him that the windfall profits provision was in accordance with all applicable regulations.

On August 1, 1992, Dr. Hager began providing full-time radiological services at BRMC. Although negotiations between Dr. Hager and BRMC continued after Dr. Hager began work, no other formal written document was prepared. According to Dr. Hager, BRMC never specified what "administrative services" the hospital was providing (or was to provide) for the 20% net collections fee, aside from using BRMC counsel to legally incorporate Bluefield Radiology Services, Inc. According to Dr. Hager, this service was of "nominal value and did not justify the above-market rate ... set by the defendants."

As to the "billing" services provided by the hospital during the period August 1, 1992 to October 29, 1992, BRMC and the other de-

the laws of West Virginia. It is affiliated with both CC and BRMC and has its principal place of business in Bluefield, West Virginia.

3. William Clayton, is a citizen of West Virginia. He is the chief operating officer of BHS.

4. Eugene P. Pawlowski is a citizen of West Virginia. He is the Chief Executive Officer of BRMC and the President of CC.

5. Phillip Stephens is a resident of West Virginia and is the vice President for Support for BRMC.

fendants decided to create a legal entity, Community Care, Inc. (CC), to collect and manage all payments to Dr. Hager's radiology group. CC rented a postal box in Dr. Hager's name. Payments to Dr. Hager's radiology group were to be sent to his postal box. A bank account was opened in the radiology group's name where monies received were deposited. Under this billing scheme, CC would retain 20% of the monies received in return for the administrative services rendered. Dr. Hager alleges that BRMC neither sought nor obtained his permission to establish this billing arrangement.

In September 1992, Dr. Hager consulted with a Washington law firm, Arent Fox, regarding paragraphs 12 and 15 of the BRMC letter. Arent Fox has expertise in Medicare reimbursement procedures and the "anti-kickback law." That law prohibits the offer, solicitation, payment or receipt of anything of value intended to be in return for an arrangement whereby patients are referred to services reimbursable under Medicare or Medicaid. *See* 42 U.S.C. § 1320a-7b. In response to his inquiry, the firm provided Dr. Hager with three opinion letters dated September 11, 17 and 18, 1992. All three of the letters state that the arrangement for billing and other unspecified services at substantially above-market rates and the provision that provided for BRMC to recoup from Dr. Hager what it considered "excess profits," (the windfall provision), were likely to be viewed by the office of the Inspector General as illegal "kickbacks," in violation of the "anti-kickback statute," 42 U.S.C. § 1320a-7b. This statute is part of the federal Medicare regulations.[2] In addition, the letters stated that any reassignment of Medicare benefits from Dr. Hager to BRMC without his authorization also violated Medicare regulations.

Of the three Arent Fox opinion letters, one was written by Mr. Harvey Yampolsky and two were written by Mr. Alan Reider. While the letters largely address the same issues there are some significant differences. In his September 11, 1992 letter Mr. Yampolsky primarily discusses the anti-kick back statute and the Medicare reimbursement violations presented by paragraphs 12 and 15 of the BRMC letter of intent. Mr. Reider, in his first letter dated September 17, 1992, similarly addresses the anti-kick back statute and the possible Medicare reimbursement violations. However, he also expresses his opinion that the agreement between Dr. Hager was never a bona fide contract. In his opinion, it was merely a letter of intent which was "to be formalized" at a later date.[3] According to this letter, the relationship created by the BRMC billing arrangements was an "at will" agreement which "[could] be terminated by either party at any time." *Id.* The second Reider letter, which is almost identical to the first—indeed, the first six paragraphs are verbatim—does not include the first letter's reference relating to whether or not the letter of intent constituted a contract between Dr. Hager and BRMC. Instead, Mr. Reider urged Dr. Hager to seek alternative billing arrangements since the overall agreement was "not dependent on BRMC providing these services." Moreover, Mr. Reider concluded that if it was dependent "it would strengthen the case against BRMC that this entire arrangement constituted a violation of the anti-fraud provisions."

After receiving these written legal opinions, Dr. Hager approached BRMC with copies of the letters to attempt to resolve the issues presented by paragraphs 12 and 15 of the July 21, 1992 BRMC letter. Dr. Hager provided BRMC with copies of the letters. He once again stated that he did not want to continue the billing arrangement as it was then constituted. The hospital responded by informing Dr. Hager that he would have to comply with paragraphs 12 and 15 of the letter, otherwise the hospital would terminate his practice.

---

2. According to Dr. Hager and Arent Fox, the going rate for the procurement of such services by billing firms "with the requisite experience and established track record of billing for physician services" during the time period in question was approximately 7–12% of net collections, as opposed to the 20% rate that was being charged by BRMC. Comp. at 7 ¶ 17.

3. Reider letter dated September 17, 1992 at 2. Mr. Yampolsky was formerly the chief counsel for the Inspector General for the Department of Social Health Services and one of the principal authors of the Medicare reimbursement regulations and anti-kickback provisions.

Over the next few months the relationship between Dr. Hager and BRMC and CC became increasingly strained. Ultimately, Dr. Hager demanded both verbally and in writing that CC cease all billing activities. He further demanded a return of all monies collected by CC. He also demanded an accounting of all funds that CC had received. According to Dr. Hager, the hospital initially refused to return the money and to provide him with the financial records. Dr. Hager states that the hospital threatened to terminate his radiology practice unless he used the hospital's billing arrangement. Dr. Hager refused. Although the hospital ultimately provided Dr. Hager with the records he requested, BRMC informed him that at midnight on October 29, 1992, his hospital privileges would be terminated and he would no longer be allowed to practice at BRMC. On July 21, 1994 he ceased practicing at BRMC. He then brought an action for damages against BRMC and the other defendants in federal court in West Virginia.

As a result of pre-trial discovery, BRMC became aware of two memoranda written by an Arent Fox associate, Susan Huntington, which were used to assist Mr. Reider in his preparation of the opinion letters he wrote to Dr. Hager. It is these memoranda that are at issue in the current action. When BRMC sought to obtain these memoranda, Dr. Hager refused to provide them on the basis that they constitute attorney work product and are therefore not subject to disclosure.

The court must address two issues. First, the court must decide whether the memoranda constitute attorney work product and are thereby protected from disclosure. If they are, the court must then determine whether Dr. Hager waived this privilege.

## II. Discussion [4]

### A. Attorney Work Product Privilege

 Dr. Hager maintains that the memoranda are shielded from disclosure by the work product privilege. The work product privilege is designed to balance the needs of the adversary system to promote an attorney's preparation in representing a client against society's general interest in revealing all true and material facts relevant to the resolution of a dispute. *Hickman v. Taylor,* 329 U.S. 495, 510–11, 67 S.Ct. 385, 393–94, 91 L.Ed. 451 (1947). The privilege exists to "promote the adversary system by safeguarding the fruits of an attorney's trial preparation from the discovery attempts of an opponent[.]" *In re Subpoenas Duces Tecum,* 738 F.2d 1367, 1371 (D.C.Cir.1984). It creates a "zone of privacy within which an attorney can think, plan, weigh facts and evidence, candidly evaluate a client's case and prepare legal theories." *Coastal States Gas Corp. v. Dept. of Energy,* 617 F.2d 854, 864 (D.C.Cir.1980).

The protection accorded to work product has been codified for certain applications in Rule 26(b)(3) of the Federal Rules of Civil Procedure, which provides in pertinent part:

[A] party may obtain discovery of documents and tangible things otherwise discoverable ... and prepared in anticipation of litigation for trial by or for another party or by or for that other party's representative (including the other party's attorney, consultant, surety, indemnitor, insurer, or agent) only upon a showing that the party seeking discovery has substantial need of the materials in the preparation of the party's case and that the party is unable without undue hardship to obtain the substantial equivalent of the materials by other means. In ordering discovery of such materials when the required showing has been made, the court shall protect against disclosure of the mental impressions, conclusions, opinions, or legal theories of an attorney or other representative of a party concerning the litigation.

---

**4.** Dr. Hager argues that BRMC's motion to compel should be denied because BRMC failed to comply with Local Rule 108(m), which requires counsel to confer prior to the filing of any nondispositive motion and attempt to narrow the issues in contention. The rule also requires the movant to state her counterpart's position with respect to the motion. Although BRMC did not timely comply with the rule, it eventually conferred with plaintiff who advised it that it would be opposing the motion. Moreover, it is clear from the record that Dr. Hager was not going to voluntarily produce the memoranda. As a result, the court will address the merits of the defendants' motion.

■ The seminal case addressing the work product privilege is *Hickman v. Taylor,* 329 U.S. 495, 67 S.Ct. 385, 91 L.Ed. 451 (1947). In *Hickman,* the Supreme Court established a two-tiered level of protection from discovery for attorney work product to provide confidentiality for attorneys' files. *Id.* at 512, 67 S.Ct. at 394.

> To the extent that work product contains relevant, nonprivileged facts, the *Hickman* doctrine merely shifts the standard presumption in favor of discovery and requires the party seeking discovery to show 'adequate reasons' why the work product should be subject to discovery. However, to the extent that work product reveals the opinions, judgments, and thought processes of counsel, it receives some higher level of protection, and a party seeking discovery must show extraordinary justification.

*In re Sealed Case,* 676 F.2d 793, 810 (D.C.Cir.1982) (citing *Hickman,* 329 U.S. at 512–13, 67 S.Ct. at 394–95). There are thus two levels of protection, one for "fact" work product which is subject to discovery upon a showing of need and hardship and a more absolute protection for "opinion" work product which is subject to discovery only upon a showing of extraordinary justification. *Id.* at 811. At issue in this case are Arent Fox's opinions concerning the legality and appropriateness of BRMC's letter. Consequently, BRMC must meet the more exacting standard.

■ Work product encompasses "interviews, statements, memoranda, correspondence, [and] briefs" of lawyers. *Hickman,* 329 U.S. at 511, 67 S.Ct. at 393–94. Moreover, "[u]nlike the attorney-client privilege, which exists solely for the benefit of the client, and can be asserted and weighed exclusively by him, the work product privilege creates a legally protectable interest in non-disclosure in two parties: lawyer and client." *Moody v. Internal Revenue Service,* 654 F.2d 795, 801 (D.C.Cir.1981). The party invoking the privilege, however, has the burden of proving that the memoranda qualify as work product. *See Coastal States Gas Corp. v. Dept. of Energy,* 617 F.2d 854 (D.C.Cir.1980); *In re PEPCO Employment Litigation,* 1992 WL 310781 (D.D.C.1992).

■ In determining whether a specific document is protected by the work product privilege, "the testing question is whether, in light of the nature of the document and the factual situation in the particular case, the document can fairly be said to have been prepared or obtained because of the prospect of litigation." *Senate of Puerto Rico v. United States Dep't of Justice,* 823 F.2d 574, 586 n. 42 (D.C.Cir.1987); [5] *see also In re Sealed Case,* 676 F.2d at 809 (stating that the work product privilege protects any material obtained or prepared by a lawyer "in the course of his legal duties, provided that the work was done with an eye toward litigation."); *Jordan v. United States Dep't Justice,* 591 F.2d 753, 775 (D.C.Cir.1978) (en banc) (stating "[t]he work-product rule does not extend to every written document generated by an attorney; it does not shield from disclosure everything that a lawyer does. Its purpose is more narrow, its reach more modest. . . . [T]he purpose of the privilege is to encourage effective legal representation within the framework of the adversary system by removing counsel's fears that his thoughts and information will be invaded by his adversary. In other words, the privilege focuses on the integrity of the adversary process itself. . . . This focus on the integrity of the trial process is reflected in the specific limitation of the privilege to materials 'prepared in anticipation of litigation or for trial.' "); *Janicker v. George Washington University,* 94 F.R.D. 648, 650 (D.D.C.1982) (holding that in order for a document to come under the attorney work product doctrine, "litigation need not be imminent [but] the primary motivating factor behind [its] creation . . . must be to aid in possible future litigation.").

■ After a careful review of the record, it is clear to the court that the memoran-

---

5. "Some cases [interpreting the work product privilege] have attributed significance to whether a document was obtained before or after litigation was commenced, but this cannot be sound. Prudent parties anticipate litigation, and begin preparation prior to the time suit is formally commenced." 8 Charles Alan Wright & Arthur R. Miller, *Federal Practice & Procedure* § 2024, at 197–98 (1970).

da were prepared in anticipation of litigation. There is no strict definition or formulation of the phrase "in anticipation of litigation." However, "[p]rudent parties anticipate litigation and begin preparation prior to the time suit is formally commenced. Thus, the test should be whether in light of the nature of the document and the factual situation in the particular case, the document can fairly be said to have been prepared or obtained because of the prospect of litigation." 8 C. Wright & A. Miller, *Federal Practice and Procedure* § 204, at 198 (1970).

Arent Fox prepared the letters having such a prospect in mind. Dr. Hager sought the advice of Arent Fox to determine whether the provisions contained in the BRMC letter were legal. The letters covered a wide range of legal issues which could be the subject of future litigation. One Arent Fox letter stated the attorney's view that paragraphs 12 and 15 could be considered illegal by the Office of Inspector General. The letter stated: "In short, I believe that paragraphs 12 and 15 can be considered illegal inducements which the BRMC is soliciting from you in return for permitting you to provide Medicare-reimbursable services at the Center." Yampolsky Letter dated, September 11, 1992. In a similar vein, Arent Fox stated that "a successful prosecution under the provisions of the anti-fraud and abuse laws could result in either civil exclusion from the Medicare Program or, in the worst case scenario, criminal prosecution leading to penalties and incarceration." Reider Letter, dated September 18, 1992. Arent Fox was also of the view that with respect to the reassignment issue, Dr. Hager "could have an independent cause of action against the hospital for improperly directing funds which were rightfully yours." *Id.* Particularly telling is the firm's suggestion that BRMC could be the subject of a *qui tam* lawsuit as a result of its practices. *Id.*

In addition, Arent Fox was of the opinion that "[i]t is well settled that no contract can be enforced if the terms of the contract require one or both parties to act in violation of a criminal statute ... Based on our analyses, a similar result would likely be reached in this case." *Id.* Finally, Arent Fox ad-

vised Dr. Hager that "if BRMC were to suggest that granting you the exclusive contract was dependent upon your agreeing to have BRMC provide these services for a fee of 20% of net collections, it would strengthen the case against BRMC that this entire arrangement constituted a violation of the anti-fraud and abuse provisions." *Id.* It is plain from the context of the letters that Arent Fox had the prospect of litigation in mind. Consequently, the memoranda constitute opinion work product that is entitled to a high degree of protection from disclosure. The court now turns to the question of whether the doctrine of waiver applies to the memoranda at issue in this case.

### B. Waiver

█ The privilege derived from the work product doctrine is not absolute. Like other qualified privileges, it may be waived. *United States v. Nobles,* 422 U.S. 225, 239, 95 S.Ct. 2160, 2170–71, 45 L.Ed.2d 141 (1975). The waiver doctrine "allows courts to retain some discretion to ensure that specific assertions of privilege are reasonably consistent with the purposes for which" the work product privilege was created. *In re Sealed Case,* 676 F.2d at 817. "Inherent in the recognition of a privilege for attorney work product is a judgment that society's interest in ferreting out the truth through litigation will not best be served by exposing a party's case to impeachment by documents reflecting the opinions or preliminary evaluations of its counsel[.]" *Id.* at 817 n. 95. However, "when a party seeks a greater advantage from its control over work product than the law must provide to maintain a healthy adversary system," the privilege should give way. *Id.* at 818. With respect to the doctrine of implied waiver, Dean Wigmore has stated:

[R]egard must be had to the double elements that are predicated in every waiver, i.e., not only the element of implied intention, but also the element of fairness and consistency. A privileged person would seldom be found to waive, if his intention not to abandon could alone control the situation. There is always also the objective consideration that when his conduct touches a certain point of disclosure, fair-

ness requires that his privilege shall cease whether he intended that result or not. He cannot be allowed, after disclosing as much as he pleases, to withhold the remainder.

Wigmore, *Evidence in Trial at Common Law* § 2327 at 636 (J. McNaughton rev. 1961). Consequently, "[t]he question with respect to implied waiver is whether Wigmore's 'objective consideration' of fairness negates [the] assertion of privilege." *In re Sealed Case,* 676 F.2d at 818.

▆▆▆▆ In the context of expert witnesses, the near absolute protection given by the courts to opinion work product must give way when a litigant puts his attorney's opinions into direct issue by designating his lawyer as an expert witness. Under Fed. R.Civ.P. 26(b)(4)(A) a party is entitled to discover the identity of experts, the facts and opinions on which the experts are expected to testify, and the grounds for those opinions.[6] Moreover, "when the activities of counsel are inquired into because they are at issue in the action before the court, there is cause for production of documents that deal with such activities, though they are 'work product.'" 4 J. Moore, *Federal Practice,* 26.64[4], at 26–447; *see also Vaughan Furniture Co., Inc. v. Featureline Mfg., Inc.,* 156 F.R.D. 123, 128 (M.D.N.C.1994) (holding that "when a party names its attorney as an expert witness, the witness must produce all documents considered by him or her in the process of formulating the expert opinion, including documents containing opinions."); *Mushroom Assoc. v. Monterey Mushrooms,*

*Inc.,* 25 U.S.P.Q.2d 1304, 1992 WL 442914 (N.D.Cal.1992) (holding that when a patent lawyer is named an expert witness, the lawyer's work product becomes discoverable, just as do the documents that any expert witness relies upon to formulate an opinion.); *Coleco Indus., Inc. v. Universal City Studios,* 110 F.R.D. 688, 690 (S.D.N.Y.1986) (noting that "[a] consistent line of cases has developed an exception to the work-product privilege where a party raises an issue which depends upon an evaluation of the legal theories, opinions and conclusions of counsel.").

▆▆▆▆ It is uncontroverted by the parties that Dr. Hager may offer Mr. Reider's opinion letters in support of the claims he has pending in West Virginia. Specifically, Dr. Hager may offer the Arent Fox letters to establish to the West Virginia court and possibly the jury that BRMC's conduct was unlawful. Dr. Hager refers to the Arent Fox opinion letters throughout his complaint when addressing BRMC's purportedly unlawful actions. One such allegedly unlawful action is BRMC's purported breach of contract. However, one opinion letter states that the BRMC letter is not a contract. Rather, the letter states that the relationship between Dr. Hager and BRMC is an at will one.[7] In his second letter (which is almost identical to the first one), however, Mr. Reider omits this conclusion.[8] The court does not opine as to the underlying merits of Dr. Hager's case, BRMC, however, should be entitled to pursue this important point.[9]

Moreover, it is undisputed by Dr. Hager that Mr. Yampolsky may be called as an

**6.** The rule provides in pertinent part:

A party may through interrogatories require any other party to identify each person whom the other party expects to call as an expert witness at trial, to state the subject matter on which the expert is expected to testify, and to state the substance of the facts and opinions to which the expert is expected to testify and a summary of the grounds for each opinion. Fed.R.Civ.P. 26(b)(4)(A)(i).

**7.** Reider Letter dated September 17, 1992 at 2.

**8.** *See* Reider Letter September 18, 1992.

**9.** At his deposition, Mr. Reider was unable to explain why he revised the September 17, 1992. Nor was Mr. Reider able to fully explain the

basis for his conclusion that BRMC's conduct violated the anti-kickback statute.

In *United States v. Western Electric Co.,* 132 F.R.D. 1 (D.D.C.1990), the government was engaged in an antitrust investigation of the defendants. The defendants sought to justify their actions by relying upon the advice of their counsel. The court permitted discovery of attorney work product. The court concluded that the defendants could not simultaneously produce documents that supported their position, while at the same time not producing documents which undermined their claim of good faith reliance. *Id.* at 3.

Similarly, Dr. Hager cannot presently rely upon the letters to support his claims and at the same time refuse to disclose the memoranda which are the basis for those letters.

expert witness in the West Virginia case.[10] "The Court's interest in the truth weighs heavily against the benefits encompassed in the privilege when a lawyer relinquishes his advocacy role and assumes the status of an independent witness for a former client." *Eckert v. Fitzgerald*, 119 F.R.D. 297, 298 (D.D.C.1988). In his expert report, Mr. Yampolsky states:

> Paragraphs 12 and 15 of the contractual arrangement contemplated by the July 21, 1992 letter signed by Kennon Hager, M.D. and [BRMC] would most probably be considered as an illegal "kickback" under the federal Medicare anti-kickback law. 42 U.S.C. 1320a–7b(b).

Dr. Hager and Arent Fox have thus put at issue the latter's opinions before the court in West Virginia. BRMC therefore needs the memoranda to address issues—whether BRMC's letter constituted a contract and whether paragraphs 12 and 15 of that letter are unlawful—interjected into the West Virginia case by Dr. Hager. *See Byers v. Burleson*, 100 F.R.D. 436 (D.D.C.1983) (holding that the plaintiff had waived the work product privilege by the information which the defendant sought was necessary to resolve an issue which the plaintiff had introduced into the case); *see also Central Nat'l*

*Ins. Co. v. Medical Protective Co.*, 107 F.R.D. 393, 395 (E.D.Mo.1985) (holding that the plaintiff had showed sufficient cause necessary to defeat the privilege when the documents at issue went to the heart of the claims at issue).

■ Arent Fox's privilege log establishes that the memoranda were used to prepare the opinion letters. These memoranda are of particular significance since the letters are substantially based upon them. In fact, the two Reider letters seem to rely almost exclusively on them. Dr. Hager does not contest the fact that he did not have direct contact with Mr. Reider. Ms. Huntington was the attorney who was the contact person for Dr. Hager. Moreover, Mr. Reider testified at his deposition that he spent only 2.3 hours preparing the letters and that some of the conclusions he reached in those letters were the result of advice he received from either Ms. Huntington or Mr. Yampolsky.[11] "Without discovery of the work product, [BRMC] will be unable to ascertain the basis and facts upon which the opinions of" the Arent Fox attorneys are based. *See Handgards, Inc. v. Johnson & Johnson*, 413 F.Supp. 926, 930 (N.D.Cal.1976). "This will undoubtedly impair [BRMC's] ability for effective cross-examination on a crucial issue." *Id.*[12]

---

**10.** The fact that Mr. Reider may or may not be called as a witness is not dispositive. Dr. Hager retained the law firm of Arent Fox. Accordingly, the opinions of Mr. Reider and Yampolsky are those of the firm that counseled Dr. Hager vis-a-vis his arrangement with BRMC. Moreover, whether or not the Arent Fox attorneys are called as witnesses is not dispositive. *See Bio–Rad Lab, Inc. v. Pharmacia, Inc.*, 130 F.R.D. 116 (N.D.Cal. 1990) (holding that in a patent infringement action, the defendant was entitled to discover the opinion work product of the plaintiff's patent lawyer, who also was retained as an expert consultant to the plaintiff's trial counsel on the infringement action. The fact that the patent lawyer would not be called as a witness was not dispositive.).

**11.** Specifically, Mr. Reider testified that he "was advised" regarding his conclusion that BRMC had incompetently provided Dr. Hager with billing services.

**12.** Although not developed by BRMC's counsel, a further point is worth elaborating upon. Since the letters were based upon the memoranda at issue, the Arent Fox attorneys have presumably reviewed them to refresh their recollection on

the matters they have opined about. If they have or do so again, they are no different than any other witness, and the memoranda become discoverable pursuant to Fed.R.Evid. 612, which provides in pertinent part,

> if a witness uses a writing to refresh his memory for the purpose of testifying ... before testifying, if the court in its discretion determines it is necessary in the interest of justice, an adverse party is entitled to have the writing produced at the hearing to inspect it, to cross-examine the witness thereon[.]

*See Fitzgerald*, 119 F.R.D. at 299. This rule has been extended to deposition proceedings where documents otherwise protected by the qualified work product privilege are used to refresh a witness's recollection. *Marshall v. United States Postal Service*, 88 F.R.D. 348, 350 (D.D.C.1980); *Barrer v. Women's National Bank*, 96 F.R.D. 202, 204–05 (D.D.C.1982). "The purpose of allowing disclosure in such instances is to preclude the attorney from selectively choosing which documents he utilizes to refresh his recollection, thereby placing the cross-examiner at a disadvantage." *Fitzgerald*, 119 F.R.D. at 299. Consequently, if the Arent

## IV. Conclusion

The memoranda at issue in this case constitute privileged work product because Arent Fox prepared them with the prospect of litigation in mind. Dr. Hager, however, has waived the work product privilege because he has placed his former attorneys' opinions at issue in the West Virginia case. Fairness requires that BRMC be afforded the opportunity to explore the basis of those opinions.

**ORDERED** that the defendants' motion to compel production of the two memoranda be and is hereby **granted;** and it is

**FURTHER ORDERED** that the defendants' have 15 calendar days from the date of this order to provide the defendants with copies of the memoranda; and it is

**ORDERED** that this miscellaneous case be closed.

**SO ORDERED.**

Fox attorneys have used or use the memoranda in the future to refresh their recollection and testify either at a future deposition or at trial,

an additional basis for disclosure would thereby be presented.